**Glenn William HOLLADAY, Petitioner,**

v.

**Donal CAMPBELL, Respondent.**

**No. CV 03–PT–1323–M.**

United States District Court,
N.D. Alabama,
Middle Division.

Oct. 12, 2006.

---

**1326**

James D Sears, Sears Law Firm, Daphne, M Bradley Almond, Almond & Cheshire LLC, Tuscaloosa, for Glenn William Holladay, Petitioner.

Troy R King, Office of the Attorney General, Henry M Johnson, Office of the Attorney General, William A Lisenby, Office of the Attorney General, William H Pryor, Jr, Office of the Attorney General, Beth Jackson Hughes, Office of the Attorney General, Montgomery, for Donal Campbell Commissioner Alabama Department Corrections, Respondent.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

PROPST, Senior District Judge.

This cause comes on to be heard on Petitioner's Objections to Magistrate Judge's Report and Recommendation filed on May 13, 2006 and a further evidentiary hearing conducted on August 17, 2006.

On August 17, 2006, the court received further amplifications, explanations and evidence from the two expert witnesses who had previously testified before the magistrate judge. The parties agreed that there are no substantial disputes as to the underlying facts and that the substantial disputes relate to the inferences drawn and conclusions reached by the two experts and the magistrate judge. Except to the extent that this court either expressly or impliedly disagrees herein with the report of the magistrate judge his report is hereby adopted. To the extent that there is any conflict between these findings of fact and conclusions of law and the report and recommendation of the magistrate judge these findings of fact and conclusions of law will prevail and apply.

### Background

On June 26, 1987, the Petitioner, Glenn Holladay ("Holladay"), was convicted in Etowah County, Alabama of the murders of Larry Thomas, Jr., Rebecca Ledbetter Holladay and David Robinson, and the jury recommended a sentence of death. On July 27, 1987, Holladay was sentenced to death by Judge Donald W. Stewart. On September 20, 1988, the Alabama Court of Criminal Appeals affirmed those convictions and the sentence. *Holladay v. State,* 549 So.2d 122 (Ala.Crim.App.1988). His convictions and sentence were affirmed by the Alabama Supreme Court on May 5, 1989. *Ex parte Holladay,* 549 So.2d 135 (Ala.1989). The United States Supreme Court declined to issue a writ of certiorari, *Holladay v. Alabama,* 493 U.S. 1012, 110 S.Ct. 575, 107 L.Ed.2d 569 (1989), and rehearing was denied shortly thereafter. *Holladay v. Alabama,* 493 U.S. 1095, 110 S.Ct. 1173, 107 L.Ed.2d 1075 (1990).

Holladay filed a motion for relief from conviction pursuant to Alabama Rule of Criminal Procedure 32.2 (then Temporary Rule 20) on September 10, 1990. On December 5, 1991, after a hearing by the trial court, this petition was denied. The denial of this Rule 32 petition was affirmed by the Alabama Court of Criminal Appeals on December 30, 1992. *Holladay v. State,* 629 So.2d 673 (Ala.Crim.App.1992). The Alabama Supreme Court declined to review the denial of that petition. On February 28, 1994 the U.S. Supreme Court denied Holladay's petition for a writ of certiorari. *Holladay v. Alabama,* 510 U.S. 1171, 114 S.Ct. 1208, 127 L.Ed.2d 555 (1994).

Holladay then filed a petition for a writ of habeas corpus in this court pursuant to 28 U.S.C. § 2254, with his primary claim being ineffective assistance of counsel. On May 29, 1998, a magistrate judge of this court filed a Report and Recommendation stating that the petition should be denied. On July 22, 1998, this court adopted that Report and Recommendation and denied Holladay's petition. This denial was affirmed by the United States Court of Appeals for the Eleventh Circuit on April 19, 2000. *Holladay v. Haley,* 209 F.3d 1243 (11th Cir.2000). The Eleventh Circuit denied rehearing and rehearing *en banc, Holladay v. Haley,* 232 F.3d 217 (11th Cir.2000), and the United States Supreme Court again denied certiorari. *Holladay v. Haley,* 531 U.S. 1017, 121 S.Ct. 578, 148 L.Ed.2d 495 (2000). Holladay was scheduled to be executed at 6:01 p.m. on May 29, 2003.

Holladay moved the Eleventh Circuit Court of Appeals for leave to file a second petition for a writ of habeas corpus. Holladay, who claims to suffer from mental retardation, filed this motion pursuant to 28 U.S.C. § 2244 based on the United States Supreme Court decision in *Atkins v. Virginia,* 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), which held that it was a violation of the Eighth Amendment of the U.S. Constitution's "cruel and unusual punishment" clause to execute mentally retarded prisoners.[1] On May 26,

2003, the Eleventh Circuit granted both his motion for leave to file for a second writ of habeas corpus and his motion for a stay of execution. *In re Holladay,* 331 F.3d 1169 (11th Cir.2003).[2]

On June 4, 2003, Holladay filed this petition for a writ of habeas corpus on *Atkins* grounds. On July 18, 2003, a magistrate judge of this court filed an order that the Respondent's answer to the petition would be treated as a motion for summary judgment. On January 9, 2004, the magistrate judge filed a Report and Recommendation suggesting that the motion for summary judgment be denied. On February 12, 2004, this court filed a Memorandum Opinion adopting in part and rejecting in part the magistrate judge's Report and Recommendation. The accompanying Order denied both the Respondent's motion for summary judgment and motion to dismiss, and referred the matter to the magistrate judge for further proceedings on the merits.

On April 14, 2006, the magistrate judge filed a Report and Recommendation suggesting that Holladay's present petition for a writ of habeas corpus be denied on the merits, asserting that Holladay had failed to establish his mental retardation by a preponderance of the evidence.[3] On May 13, 2006, Holladay objected to the Report and Recommendation, arguing that the magistrate judge had made inappropriate findings of fact and had applied incorrect legal standards. On June 16, 2006, Donal

---

**1.** Typically, the Supreme Court has enunciated a broad principle and left the hard work up to the lower courts. It is easy to state that mildly mentally retarded people should not be executed. *It is not so easy to determine who* is mildly mentally retarded. For another case where the court wrestled with this issue, *see Rivera v. Dretke,* 2006 WL 870927 (S.D.Tex. Mar.31, 2006) (unpublished opinion).

**2.** The court opinion in that case also provides a history of the proceedings leading up to that opinion.

**3.** Two "dueling experts" testified before the magistrate judge. The magistrate judge's recommendation is substantially based upon his acceptance of Dr. Kimberly Ackerson's opinions and his rejection of those of Dr. Karen Salekin. Dr. Ackerson's specific opinions may be influenced by her early opinion that Petitioner is not mentally retarded and that further testing was not needed.

Campbell, the Commissioner of the Alabama Department of Corrections, filed a response to Holladay's objections.[4]

### General Historical Observations

The history of mental retardation has been an evolving one, as to stereotyping, definition, treatment, etc. As has been the case with mental illness, there has been improvement in the understanding of mental retardation.[5] The diagnosis of mental retardation remains, however, encumbered by amorphousness comparable to clutching mercury, as illustrated by the contradicto-ry opinions of the experts in this case. The ultimate decision may equate to the game of "Button, button, who's got the button?"[6]

Both experts testified that "one size fits all" with regard to mental retardation determinations. The following language in American Association on Mental Retardation (hereinafter AAMR), *Mental Retardation* (10th ed.2002) suggests to the contrary:

> The functions or reasons for applying a definition of mental retardation to a per-

---

**4.** Petitioner argues that Alabama law (specifically, Ala. R.Crim. P. 32) does not allow the filing of successive petitions, thereby foreclosing the Petitioner from even attempting to do so before filing an *Atkins* claim in this court. That argument is doubtful. This court does not reach that issue.

This court earlier held that the Respondent had waived the defense of exhaustion of remedies. "Exhaustion of state remedies is not a state law concept; it is a defense in federal court to a federal habeas corpus petition." *Hills v. Washington,* 441 F.3d 1374, 1378–79 (11th Cir.2006). In a Memorandum Opinion filed February 12, 2004, this court noted:

> For the record, in the answer to the petition for writ of habeas corpus respondent wrote, Holladay's claim is not exhausted because it has never been raised in state court[, but].... 
> > [r]espondent does not allege [that said claim is] unexhausted... because it would be futile to make this claim in state court because the claim would be procedurally defaulted in state court for a number of reasons (not filed within statute of limitations, filed in successive petition, and not raised at trial or on appeal). *See* Rule 32.2(a)(3), (a)(5),(b) and (c), Ala. R.Crim.P.

Document # 10, at 14 n. 5

*In re Holladay, supra,* clearly stated that the exhaustion issue was reserved. That opinion was dated May 26, 2003. The above-stated answer was filed on July 8, 2003. The Respondent affirmatively waived the exhaustion defense. For a discussion with regard to whether the presentation of new evidence reopens the exhaustion issue *see Morris v. Dretke,* 413 F.3d 484 (5th Cir.2005).

**5.** Some progress is indicated by comparing *Atkins, supra,* with *Buck v. Bell,* 274 U.S. 200, 47 S.Ct. 584, 71 L.Ed. 1000 (1927) (all right to sterilize "feeble-minded"). Also *compare Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). It is of interest that after Justice O'Connor noted in *Penry* that only two states prohibited execution of mentally retarded offenders, sixteen additional states and the federal government passed legislation banning the execution of mentally retarded offenders by the time *Atkins* was decided. As will be discussed hereinafter, mental retardation is not considered a mental illness.

**6.** "The MR construct is useful in that it allows mostly deserving individuals to get services and supports they often desperately need. It is fiction in that there is no justification for the idea that there is a magical line (let alone one determined by a test score) dividing those who have or do not have this condition." American Association on Mental Retardation (AAMR), *Mental Retardation, infra,* at 35. The magistrate judge stated "[T]he seeming simplicity and clarity of the concept of mental retardation are deceptive." (Report and Recommendation at 7, footnote omitted). The magistrate judge also referred to mental retardation analysis as "convoluted" and involving a "tangled diagnostic template..." (*Id.* at 10). The magistrate judge questioned whether the "definition and application of mental retardation as set out in *Atkins* and Alabama law" meet evidentiary standards required pursuant to Rule 704 of the Fed. R. Ev. and the *Daubert* case. (*Id.* at n. 33).

son are multiple and may include diagnosis, classification, and/or planning supports. Each function may have multiple purposes. For example, the diagnostic function may be applied to determine eligibility for services, benefits, or legal protections. Likewise, there are different grouping purposes for classification, including service reimbursement or funding, research, services, communication, and so forth. Supports planning for a given person should relate to that individual's strengths and needs in all five dimensions of individual functioning: Intellectual Abilities; Adaptive Behavior; Participation, Interactions, and Social Roles; Health; and Context.

*Id.* at 37. Some determinations may be for the purpose of inclusion of mentally retarded persons; some for exclusion.[7]

Indicative of the evolution is the fact that one of the most subjective essential elements of mental retardation, the adaptive behavior or adaptive functioning factor, was not added to the American

Association on Mental Deficiency (AAMD)[8] definition until 1959. AAMR, *supra,* at 24. Not only was its inclusion late, "consensus on its construct is still lacking.". . . "[T]here is no universal agreement on the factor structure of adaptive behavior, the best method to assess it, the role that adaptive behavior or skill deficits should play in the definition and diagnosis of mental retardation and the relationship between the concepts of intelligence and adaptive behavior. . . . [T]here have been many debates over the accuracy of measuring adaptive behavior (and adaptive skills) . . . and whether adaptive behavior assessment should be a requirement for diagnosing mental retardation . . ." *Id.* at 24.[9]

From 1959 to 1973 the AAMR definition of mental retardation included persons with IQ scores of 70–85 as "borderline retarded." "This group is no longer labeled retarded by professionals in the field." Ellis and Luckasson, *supra* n. 9, at 422, n. 44.[10] "Mildly retarded people have

---

7. For example, *see* the following cases involving social security disability: *Hodges v. Barnhart*, 276 F.3d 1265 (11th Cir.2001); *Markle v. Barnhart*, 324 F.3d 182 (3rd Cir.2003); and *Brown v. Sec'y of Health and Human Servs.*, 948 F.2d 268 (6th Cir.1991). For a further discussion of this issue, *see Ex parte Briseno*, 135 S.W.3d 1 (Tex.Crim.App.2004). *See also Rivera, supra* n. 1.

8. The American Association on Mental Deficiency is the former name of the American Association on Mental Retardation.

9. For a full history of the evolution in the development mental retardation standards, *see* James W. Ellis and Ruth A. Luckasson, *Mentally Retarded Criminal Defendants*, 53 Geo. Wash. L.Rev. 414 (1984–85) and R.C. Scheerenberger, *A History of Mental Retardation* (1983). For a further history, *see City of Cleburne, Texas, et al. v. Cleburne Living Center, et al.*, 473 U.S. 432, 461–465, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). ("Even so, the Court of Appeals correctly observed that through ignorance and prejudice the mentally retarded 'have been subjected to a history of

unfair and often grotesque mistreatment.' " *Id.* at 454, 105 S.Ct. 3249). Among other books on mental retardation are: George S. Baroff, *Mental Retardation, Nature Cause and Management* (3rd ed.1999) and Ronald L. Taylor, *Assessment of Individuals with Mental Retardation* (1997). *See also* Nava Feldman, *Application of Constitutional Rule of Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), *that Execution of Mentally Retarded Persons Constitutes "Cruel and Unusual Punishment" in Violation of Eighth Amendment*, 122 A.L.R. 5th 145 (2004).

10. One reason that the I.Q. level for mental retardation was lowered was to avoid the stigma of persons being classified as "retarded." This may be the same reason that the adaptive behavior element was added. As an illustration of the confusion in this area, the following is a verbatim excerpt from a Federal Bureau of Prisons Forensic Report dated September 22, 2006, with regard to a defendant whose case is pending in this court. The report is signed by a licensed clinical psychologist:

IQ scores in the range between 50 to 55 and approximately 70 and thus have substantial disability." *Id.* at 423.

"Many forms of mental illness are temporary, cyclical, or episodic. Mental retardation, by contrast is permanent. Thus, legal rules which focus upon the prospect of 'curing' mentally ill people may not address the condition of retarded people in an appropriate or useful way." *Id.* at 424 (footnote omitted).[11] The authors further state, however, "The consequences of the mental impairment, including deficits in adaptive behavior may be ameliorated through education and habilitation. Therefore, it is not accurate to state categorically that mental retardation is 'permanent' or 'incurable.'"[12] There is no evidence that the Petitioner has ever had such education or habilitation.

### Petitioner's Objections

The Petitioner's objections can be summarized as follows:

1. "The magistrate judge incorrectly found that the IQ scoring cutoff for a finding of mental retardation is 70 or below..." The cutoff as stated by the magistrate judge fails to recognize the well established rule that the IQ cutoff for mental retardation is 70 *plus or minus five points.* See *Atkins,* 536 U.S. at 309, n. 5, 122 S.Ct. 2242.[13]

2. The magistrate judge erred in finding that the WAIS is the "most universally applied standardized testing instrument, in part because Stanford–Binet exams typically generate lower IQ scores."

3. The Petitioner objects to the magistrate judge's conclusion "which questions the validity of the IQ examination[s] performed on the Petitioner in 1958," in which he scored 49 and 56.

4. The Petitioner objects to the magistrate judge's conclusion "that the opinions of Dr. Kimberly Ackerson are 'well reasoned and better supported by the record than Dr. Salekin's view' thus accepting Dr. Ackerson's assessment of the Petitioner as functioning in the borderline range of intelligence."

5. The magistrate judge erred in discounting the import and findings of the

The defendant was administered the Wechsler Abbreviated Scale of Intelligence (WASI), a commonly used brief screening instrument designed to assess an individual's current level of cognitive functioning. Mr. McCain's WASI results indicated he obtained an overall IQ score of 53 +/–2, (less than the 1st percentile), which falls within the low borderline range of intellectual abilities. His verbal IQ score of 55 +/–3 (less that the 1st percentile), and Performance IQ score of 58 +/–3 (less that the 1st percentile), also fell within the low borderline range.

*Rivera, supra* n. 1, states that since 1908 the AAMR or its predecessors have used ten different definitions of "mental retardation." *Id.* at 16.

11. This court recommends a full reading of Ellis and Luckasson, *supra* n. 9. "Professor Luckasson was an author of the AAMR's 1992 definition of mental retardation, the version

relied upon in *Atkins* and Alabama" (Magistrate Judge's Report and Recommendation at 8, n.5). The court also recommends a full reading of Baroff, *Mental Retardation, Nature, Cause, and Management* (3rd ed.1999).

12. In *Cleburne Living Center v. City of Cleburne, Tex.,* 726 F.2d 191, 198 (5th Cir.1984) the court stated that the condition of the mentally retarded is "immutable." The Supreme Court agreed in *City of Cleburne Texas v. Cleburne Living Center, supra* n. 9. "The vast majority [of the mentally retarded]—approximately 89%—are classified as mildly retarded, meaning that their IQ is between 50 and 70." *Id.* at 443, n. 9, 473 U.S. 432. "Mental retardation is caused by a variety of factors, some genetic, some environmental, and some unknown." *Id.*

13. As will be indicated hereinafter, this is not necessarily the Alabama law.

Woodcock–Johnson test administered by Dr. Salekin.

6. The Petitioner objects to the magistrate judge's total rejection of the retroactive use of the Scales of Independent Behavior–Revised (SIB–R) test.

7. The Petitioner objects to the magistrate judge's rejection of all forms of adaptive functioning testimony except for school, social service and prison records.

8. The magistrate judge erred in not giving sufficient weight to the Petitioner's intellectual and adaptive functioning skills prior to the age of 18, including health and safety factors; academic difficulties; IQ scores of 49 and 56 (1958) and 54 (1963); reports of a school principal, a special education teacher and a physician; DHR records which refer to petitioner as mentally retarded; and the testimony of family members and friends.

9. The magistrate judge did not give sufficient weight to the following IQ test scores of Petitioner:

1978  69
1979  72
1987  71
1991  65

even though Dr. Ackerson viewed the four tests as being reliable and valid.

*Respondent's Response to Objections*

1. The Respondent did not specifically respond to the "70 and 75" or lower objection of the Petitioner. The Respondent generally argues that the "magistrate correctly applied the proper legal standard..." and that "Holladay completely fails to show how this alleged failure entitles him to a different outcome."

2. The Respondent argues that the magistrate judge's finding that WAIS–III is the preferred assessment is supported by the evidence including the testimony of Dr. Salekin.

3. The Respondent supports the magistrate judge's questioning of the validity of the IQ examinations in 1958. This support purportedly comes from the testimony of Dr. Ackerson concerning the inconsistency of the scores.

4. Respondent agrees with the magistrate judge's conclusions that Dr. Ackerson's opinions are better supported than those of Dr. Salekin, even though Dr. Ackerson did not administer an intelligence test because she had decided that it would not be helpful.

Further, Respondent argues, Dr. Ackerson did, in fact, contact third parties and considered records which contained information from third parties.

5. Respondent argues that the Petitioner does not dispute that Woodcock–Johnson is an achievement test and not an intelligence test.

6. Respondent argues that even Dr. Salekin acknowledged that her use of SIB–R was unorthodox in this case.

7. Respondent says there is nothing in the record to suggest that the magistrate judge did not consider all the evidence concerning Holladay's adaptive functioning.

8. Respondent says that the magistrate judge carefully considered the evidence concerning the petitioner's intellectual and adaptive functioning before he turned 18.

9. Respondent argues that the magistrate judge carefully considered the Petitioner's intellectual functioning and adaptive functioning as an adult and that the evidence supports Dr. Ackerson's view that Petitioner is not mentally retarded even though she believes that his adult IQ scores (ranging from 65 to 72) are reliable and valid.

## Standards of Review

■ It is settled in the Eleventh Circuit that the district court must rule on the merits of each and every claim discussed in the magistrate judge's report and recommendation. *Callahan v. Campbell*, 396 F.3d 1287, 1289 (11th Cir.2005) ("When a district court does not address all such claims, we 'will vacate the district court's judgment without prejudice and remand the case for consideration of all remaining claims whenever the district court has not resolved all such claims.'") (*quoting Clisby v. Jones*, 960 F.2d 925, 938 (11th Cir. 1992)).[14] "[A] district court judge need not rehear the testimony on which the magistrate relied in accepting the magistrate's findings or recommendation. Rather...the statutory command to district court judges to 'make a de novo determination' of those portions of the magistrate's findings and recommendations to which the parties object is satisfied as long as the judge, rather than the magistrate, exercises 'ultimate adjudicatory power.'" *Proffitt v. Wainwright*, 685 F.2d 1227, 1237 (11th Cir.1982) (*quoting United States v. Raddatz*, 447 U.S. 667, 674–76, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980)). "[I]n a situation involving the constitutional rights of a criminal defendant...the district judge should not enter an order inconsistent with the credibility choices made by the magistrate without personally hearing the live testimony of the witnesses whose testimony is determinative." *Louis v. Blackburn*, 630 F.2d 1105, 1109 (5th Cir.1980).

Determining whether the order of the district judge is "inconsistent with the credibility choices made by the magistrate" is a two-step process. "First, we must review the magistrate's recommendation and decide whether credibility choices he made in assessing [a claim] were dispositive. If the answer is affirmative, we must then scrutinize the district court's order to ascertain if the judge's rejection of the magistrate's recommendation was also a rejection, whether express or implied, of the magistrate's credibility choices." *Proffitt*, 685 F.2d at 1237. "The rationale for requiring district judges to rehear testimony before rejecting credibility choices made by a magistrate lies in the recognition that credibility choices frequently depend on the trier of fact's assessment of the witness's demeanor...[u]nless the words spoken by the witness are inherently ambiguous, however, the decision whether a second hearing is necessary must be left to the sound discretion of the district judge." *Id.* at 1243.

"Findings of fact made by a United States magistrate...and which are accepted and adopted by the district court without objection by any party, may be reviewed on direct appeal only for 'plain error or manifest injustice.'" *LoConte v. Dugger*, 847 F.2d 745, 749–50 (11th Cir. 1988) (*quoting Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. Unit B 1982)). "Whenever any party files a timely and specific objection to a finding of fact by a magistrate, the district court has an obligation to conduct a *de novo* review of the record with respect to that factual issue...To the extent that the magistrate has made findings of fact based upon the testimony of the witnesses heard before the magistrate, the district court is obligated to review the transcript or listen to the tape-recording of those proceedings." *LoConte*, 847 F.2d at 750. "If the district court's account of the evidence is plausible in light of the record reviewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence

---

**14.** Note that the reference is to "claims," not "objections." Here, there is only one "claim." That claim is that Petitioner is mentally retarded.

differently." *Id.* "There is little practical distinction between the 'plain error' standard of review applicable to unchallenged findings of fact by a magistrate and the 'clearly erroneous' standard of review relevant to fact findings by the district judge." *Id.* "[A]n appellate court must be satisfied that a district judge has exercised his nondelegable authority by considering the actual testimony, and not merely by reviewing the magistrate's report and recommendations." *Stokes v. Singletary,* 952 F.2d 1567, 1576 (11th Cir.1992) (*quoting United States v. Elsoffer,* 644 F.2d 357, 359 (5th Cir. Unit B 1981)).[15]

*Advice from Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002)*

"Those mentally retarded persons who meet the law's requirements for criminal responsibility should be tried and punished when they commit crimes. Because of their disabilities in areas of reasoning, judgment, and control of their impulses, *however, they do not act with the level of moral culpability that characterizes the most serious adult criminal conduct.* Moreover, their impairments can jeopardize the reliability and fairness of capital proceedings against mentally retarded defendants." *Atkins,* 536 U.S. at 306–307, 122 S.Ct. 2242 (emphasis added).

. . . . .

"The American Association on Mental Retardation (AAMR) defines mental retardation as follows: '*Mental retardation* refers to substantial limitations in present functioning. It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas:

communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. Mental retardation manifests before age 18.' Mental Retardation: Definition, Classification, and Systems of Supports 5 (9th ed.1992)."

The American Psychiatric Association's definition is similar: "The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B). The onset must occur before age 18 years (Criterion C). Mental Retardation has many different etiologies and may be seen as a final common pathway of various pathological processes that affect the functioning of the central nervous system. Diagnostic and Statistical Manual of Mental Disorders 41 (4th ed.2000). 'Mild' mental retardation is typically used to describe people with an IQ level of 50–55 to approximately 70. *Id.* at 42–43." *Id.* at 308, n. 3, 122 S.Ct. 2242 (emphasis in original).

. . . . .

"*Dr. Nelson administered the Wechsler Adult Intelligence Scales test (WAIS–III), the standard instrument in the United States for assessing intellectual functioning.* AAMR, Mental Retardation, supra, (Emphasis added). The WAIS–III is scored by adding together the number of points earned on differ-

---

**15.** This court has considered the further testimony of the two expert witnesses and has fully read and considered the transcript of the hearing before the magistrate judge. This court has considered all issues, factual and legal, *de novo.*

ent subtests, and using a mathematical formula to convert this raw score into a scaled score. The test measures an intelligence range from 45 to 155. The mean score of the test is 100, which means that a person receiving a score of 100 is considered to have an average level of cognitive functioning. A. Kaufman & E. Lichtenberger, Essentials of WAISIII Assessment 60 (1999). *It is estimated that between 1 and 3 percent of the population has an IQ between 70 and 75 or lower, which is typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition.* 2 Kaplan & Sadock's Comprehensive Textbook of Psychiatry 2952 (B. Sadock & V. Sadock eds. 7th ed.2000)." *Id.* at 309, n. 5, 122 S.Ct. 2242 (emphasis added).

.     .     .     .     .

"Not all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus. As was our approach in *Ford v. Wainwright,* 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986), with regard to insanity, 'we leave to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences.' *Id.* at 405, 416–417, 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335." *Atkins,* 536 U.S. at 317, 122 S.Ct. 2242.

"As discussed above, clinical definitions of mental retardation require not only subaverage intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction that became manifest before age 18." *Id.* at 318, 122 S.Ct. 2242.

*Evidence*

The following is underlying evidence which this court divides into these categories: [16]

(1) May Tend to Support that the Petitioner's IQ is 70 or Below;

(2) May Tend to Support that the Petitioner's IQ is not 70 or Below;

(3) May Tend to Show Limitation(s) in Adaptive Functional Behavior;

(4) May Tend to Show the Absence of Limitations in Adaptive Functional Behavior.

The court also includes the results of Scales of Independent Behavior Revised (SIB–R) as administered by Dr. Salekin. This judge gives greater weight to the SIB–R than did the magistrate judge. The magistrate judge questioned the credibility of some witnesses whose testimony is referenced herein. Dr. Salekin, in arriving at her expert opinion, gave credence to the same statements. This court concludes that she was allowed to do so.

The following abbreviations are employed for oft-used terms and persons:

Scales of Independent Behavior Revised (SIB–R)

Glenn Holladay (Holladay)

Raymond Fuqua (RF)

Mental Retardation (MR)

Helen Bryan (HB)

State of Alabama Department of Human Resources (DHR)

Social Skills (SS)

Communication (COMM)

Self–Direction (SD)

Work (WORK)

Self–Care (SC)

Home Living (HL)

Health and Safety (HS)

---

**16.** The court's listing of evidence in this section does not constitute findings of fact.

Community Use (CU)

Except as noted, parenthetical citations are to the transcript of the hearing held before the magistrate judge.

### 1) May Tend to Support that the Petitioner's IQ is 70 or below

- Holladay's mother drank frequently while pregnant with all of her children, including Holladay. (Magistrate Judge's Report and Recommendation at 45, *citing* DHR records).
- DHR records are "replete" with reports of Holladay's father verbally and physically abusing his wife and children throughout the time they all lived together (Magistrate Judge's Report and Recommendation at 46, *citing* DHR records).
- Holladay failed the 1st and 2nd grades (Salekin, 151:7–10). His formal education ended when he quit school at age 16 (Salekin, 151:21). While in school, Holladay received one C-minus, one D-minus, one D, and the rest were all F's. In the lower elementary school years, when no letter grades were assigned, he received all "unsatisfactory" marks (Salekin, 152:1–10).
- Holladay's principal stated that Holladay is "definitely" MR (Salekin, 152:11–16).
- Holladay met all criteria for special education but the class was too full to accommodate his admission (Salekin, 152:17–23).
- Holladay once attended special education classes in an Etowah County school. There, a teacher assessment stated that he "did not have the ability to learn on the level of an average child" (Salekin, 153:3–9).
- 1958 IQ tests: at age 9, Holladay scored a 49 and a 56, respectively, on two administrations of the Wechsler test (Salekin, 167:3–4).

- Holladay's mother reports to DHR workers that Holladay is her "slow child or retarded child" in May 1959 (Magistrate Judge's Report and Recommendation at 45, n. 41, *citing* DHR records).
- September 1962: Holladay's mother tells DHR that Holladay's teacher was going to seek "special help" for Holladay so that he could learn to read (Magistrate Judge's Report and Recommendation at 50, n. 43, *citing* DHR records).
- 1963: noting Holladay's IQ score of 54, a DHR report calls Holladay "barely educable" (*In re Holladay*, 331 F.3d at 1175).
- 1969 IQ test: Holladay scored a 66 (Salekin, 169:20–21). This score was two standard deviations below the mean (Salekin, 170:1–7).
- 1969: A Dr. Wileman concludes that Holladay is MR (Ackerson, 451:19–22).
- Other IQ tests: 69 (1978), 68 (1979), 65 (1991). (*In re Holladay*, 331 F.3d at 1174).
- Average of all IQ test scores, 1958–1991: 64 (*Id.* at 1175).
- Both the trial judge and the prosecutor in Holladay's criminal trial characterized Holladay as "slightly mentally retarded" (*Id.*).
- 2005 Stanford–Binet test: scored a 59 (verbal)/58 (full scale)/61(nonverbal) (Salekin, 179:16).

### 2) May Tend to Support that the Petitioner's IQ is not 70 or below

- Holladay's IQ test scores fluctuate, an indicator of unreliability (Ackerson, 348:19–25).
- Holladay's verbal/performance splits have "flip-flopped" over the years, which casts doubt upon their veracity because consistency in these splits is a

hallmark of true MR (Salekin, 237:4–8).

- A special education teacher in Etowah felt that Holladay's limitations were "environmentally based" and not intellectually based (Salekin, 153:19–23).
- Social Worker's observation of Holladay in 1962: "I believe though it has been Glen's school background, family situation and lack of interest that has thrown him behind more so than a lack of intelligence" (Magistrate Judge's Report and Recommendation at 50, *citing* DHR records).[17]
- Mrs. F.D. Walton (Holladay's teacher) told the DHR social worker in May 1964 that she was "encouraged by Glenn's progress in the remedial class work at Etowah High," that he seemed "more emotionally disturbed because of his family situation than anything else," and that she "did not believe [Glenn's] IQ was too low to enable him to learn" (Magistrate Judge's Report and Recommendation at 53, *citing* DHR records).
- 1979 IQ test: 72 (Salekin, 171:3–4). Others include 73 (1969) and 71 (1987) (*In re Holladay*, 331 F.3d at 1174).
- 1986–87: doctors at Taylor–Hardin opine that Holladay is functioning above the "borderline" intellectual range due to his "level of speech, history of autonomous living, and his streetwise intelligence" (Magistrate Judge's Report and Recommendation at 67).

### 3) May Tend to Show Limitation(s) in Adaptive Functional Behavior Factors

- Holladay could not cook anything substantial, such as a meal for a family (D. Holladay, 25:5–7). **[HL\SC]**

- Holladay did not assist in taking care of his younger siblings (D. Holladay, 25:8–40).**[HL]**
- The Holladay household was not a place where a developmentally challenged individual would have grown up with a great deal of support (Salekin, 141–143).**[HL]**
- Holladay risked serious injury or death by playing frivolously around train tracks while growing up (Salekin, 144:9–15). When asked about this by DHR, Holladay "apparently didn't think there was any danger in it and seemed surprised that the [DHR] worker felt that me might have lost an arm or leg or his life" (Magistrate Judge's Report and Recommendation at 48, *citing* DHR records). **[HS]**
- There is evidence that Holladay might have suffered head injuries as a child. Biomedical factors, such as head injuries, can contribute to MR (Salekin, 145:13–14; 146:15–25; 147:1–14).**[HL]**
- Holladay was seen running away from law enforcement following his sundry illegal conduct. His demeanor was such that he didn't appear to realize the seriousness of it—he would be smiling, as if it were "like a game" to him (Bryan, 53:13–17).**[HS]**
- Holladay attempted to give himself an enema, made a large mess, did not seem embarrassed, and was unable to adequately clean it up (Fuqua, 66:12–25; 67:1–18).**[HS]**
- Holladay can use a standard telephone, but the prison telephones, which require input of numerical codes within a limited time frame, are difficult for him to use because they require "speed, as well as memory," and Holladay has trouble in both areas (Salekin, 157:3–11).**[SC]**

---

17. Some of the DHR records refer to Glenn Holladay as "Glen Holladay."

- Holladay, who casually notes his propensity to engage in sexual acts with animals, reports that he does not understand why such conduct with animals would be considered strange, since animals are his "best friend[s]" (Salekin, 178:5–7).[HS]

- Holladay was "unaccepted" as a child; "mocked, ridiculed, and teased" by older teenagers; would get into fights; was called "dummy, idiot, crazy." (D. Holladay, 13:19–25)[SS]

- Holladay had poor vocabulary. He also had difficulty in understanding conversations and in following set patterns of conduct/behavior (D. Holladay, 14: 3–10). **[COMM]**

- Holladay as a teenager would isolate himself or associate with younger children (D. Holladay, 16:9–25). **[COMM/SS]**

- Holladay could drive but had trouble identifying where he was, and could not relay his whereabouts to others except by landmarks (D. Holladay, 19:4–8). **[SD\COMM]**

- Holladay could not function well at painting job with father and brother; didn't know the difference b/w a scraper and a screwdriver (D. Holladay, 20:1–6). He would not understand what to do, and would grow frustrated and run away (D. Holladay, 20:14–18). Set up a ladder upside down (D. Holladay, 20:23–25; 21:1–9); couldn't be depended on to buy paint for the job (D. Holladay, 21:11–12). **[WORK]**

- Holladay was unable to work the machines at a the Kelly's Tire store where he worked; relegated to manual labor only (D. Holladay, 22: 21–25). **[WORK]**

- Holladay never had a bank account, paid household bills, or rent. All of this would be done by his wives. Holladay did not handle money well (D. Holladay, 23:11–24), but over time he could marginally do so with assistance from his brother (D. Holladay, 24:1–4). **[SC\SD\HL]**

- Holladay's communications skills have not improved since he was a teenager (D. Holladay, 25:19–25; 26:1). **[COMM]**

- Holladay played with Helen Bryan and others her age (10 years younger than Holladay) (Bryan, 50:6–25; 51:1–3); he behaved more like someone of a younger age group (Bryan, 51:6–15), even "childlike" (Bryan, 52:20–21). **[COMM/SS]**

- Holladay told HB's mother that he felt more comfortable in incarceration (Bryan, 54:22–24). **[SS/HL]**

- Holladay sends HB and her mother letters and cards and such; someone else always writes it for Holladay, but Holladay will draw little smiley faces or crosses or something on them (Bryan, 55:7–21). **[COMM]**

- Holladay does not have many friends on death row (Fuqua, 62:12–17). **[SS]**

- Considers Holladay to be "a slow or special needs individual" (Fuqua, 62:19–21); has to talk to him slowly and succinctly for Holladay to understand him (Fuqua, 63:1–5). **[COMM/SS]**

- Holladay has fellow inmates assist him in reading/writing letters, and in filling out "store slips." He cannot perform these tasks himself (canteen order) (Fuqua, 64:3–14). **[SC\SD\COMM]**

- Holladay quit his job as a "runner" on the cellblock because of inmate complaints that he was not doing the menial jobs satisfactorily (Fuqua, 65:1–19). However, RF later said that this was more of a case of the inmates having personal dislike for Holladay, not that he could not do the job (Fuqua, 75:6–25; 76:1–4). **[WORK]**

- Holladay's jobs were menial, and did not require significant intellectual ability. These are the types of jobs that could be performed by someone with MR (Salekin, 147:18–25; 148:1–8). **[WORK]**
- Even when Holladay did work, it was not on his own initiative. Someone else helped him find work (Salekin, 196:8–10). **[WORK]**
- Someone with mild MR would do well in a prison setting because it is so structured. Dr. Salekin opines that this explains why Holladay does so well there (Salekin, 159:11–25; 160:1–10). **[HL\SS\CU\SD\COMM]**
- Holladay is very tangential in conversations. At times it is very difficult to keep him on track (Salekin, 176:3–17). **[COMM]**

*4) May Tend to Show the absence of Limitation(s) In Adaptive Functional Behavior Factors*

- DHR worker interviewing Holladay during his boyhood states, "Glen...talked with a fair amount of common sense" (Magistrate Judge's Report and Recommendation at 48, *citing* DHR records). **[COMM/SS]**
- Holladay was able to move among foster homes "with no difficulty" (Ackeron, 366:12–22). **[SS/CU]**
- Holladay would get up and get ready for school (D. Holladay, 31:2–4). **[HL/SD]**
- Holladay was very clean; observed better hygiene habits than his siblings (D. Holladay, 24:11–25); capable of cleaning his room (D. Holladay, 25:1). **[HS]**
- Holladay could cook eggs (D. Holladay, 25:2–5). **[HL]**
- Holladay could buy a Coke at a convenience store without assistance (D. Holladay, 24:5–7). Although Holladay had to have the menu read to him, he was able to choose what he wanted and knew enough to ask that the price specials be read to him (D. Holladay, 34:5–20). **[SC/CU/COMM]**
- Holladay is able to make small purchases for himself, such as buying a hamburger at a fast food restaurant; works well with paper currency, not as well with change (Salekin, 148:15–24). **[CU]**
- Holladay could drive a car around town as a young teenager even though illiterate (D. Holladay, 18:20–23). Later in life, he was able to drive himself back and forth from Atlanta to Gadsden (D. Holladay, 34:22–25; 35:1–4). **[CU/SD]**
- Holladay can drive a car safely and with navigational accuracy in a familiar place (Salekin, 148:25, 149:1–3). In unfamiliar places, he picks up hitchhikes and gets information from them (Salekin, 150:1–11). **[SC/SD/COMM/SS]**
- Holladay did not have trouble following directions at his manual labor job at Kelly Tire in the early 1980's (D. Holladay, 39:4–15). **[WORK/COMM]**
- Holladay, a diabetic, has learned how to check his insulin level with the blood machine (Salekin, 156:6–17). **[SC/HS/SD]**
- Holladay is capable of carrying on a conversation; does not have a focus problem (Morgan, 86:13–20). **[COMM]**
- Holladay knew how to use the telephone, cook, and to dress himself (Morgan, 85:6–25). **[HL/SC/SD]**
- Holladay knew how to write (Morgan, 84:22–25; 85:1–3). **[FA]**
- Holladay once worked at a chicken plant (Morgan, 83:10–12), and at a tire store (Morgan, 83:14–15). **[WORK]**

- While a fugitive from the law, Holladay did not call his father because he suspected that the telephone would be bugged (Ackeron, 387:23–25, 388:1). [SC]
- In his deposition, Holladay's vocabularly is suspiciously learned (uses words like "approximately") (Ackeron, 385:6–9). [COMM/SS]
- While on the run, Holladay knew enough to trade in his car occasionally, sometimes making extra money from the transaction (Ackeron, 383:15–21). [CU/SD/SC/SS]
- Holladay consciously pursued women who he wanted to "peep" on (Ackeron, 372:2–10). [SD]
- 2 of the 3 members of a psychological reviewing commission found Holladay to be "socially appropriate" (Ackeron, 357:11–18). [SS]
- Former psychologist said that Holladay was a "streetwise" individual with the adaptive skills to survive (Ackeron, 355:21–23). [CU/SD/SS/COMM/SC]
- Holladay was able to invoke the Fifth Amendment on his own during his deposition, and was able to withstand cross-examination at trial (Salekin, 260–61). [COMM]
- Holladay can copy information from one prison form (visitor, telephone) to another (Salekin, 251:1–23). [COMM]
- Holladay used an alias to avoid being identified while he was a fugitive (Salekin, 244:1–10). [SC/SD]
- Holladay had enough soundness of mind to seek out the cheapest hotels while a fugitive from the law. (Salekin, 242:20–25; 243:1–2) This is seen during his 1986 escape from the Cherokee County Jail and from the three murders later that year (Salekin, 247:8–19). [SC/SD]
- Following his escape from Cherokee County Jail in 1986, Holladay managed to elude capture for seven months, driving himself to cities all over the Southeast and Midwest (Salekin, 240:16–22). [SC/SD]
- Holladay called his brother after the murders and asked him to come and bring money and to help him (D. Holladay, 19:11–18). [SC/SD]
- Holladay knows how to use the telephone (Fuqua, 76:5–9). [HL]
- RF says it's possible that Holladay might have been "putting on" at times by pretending not to understand, but could not recall any incidences of this (Fuqua, 72:7–13). [SD]
- Holladay stays on topic "for the most part" during conversations (Fuqua, 72:14–17). [COMM/SS]
- Holladay initiates assistance from other inmates; it isn't a matter of them going and offering their help, he asks for it (Fuqua, 71:3–6). [SD/SC]
- Holladay displays good hygiene and keeps his cell clean, though the guards have to remind him to clean his cell (Fuqua, 65:20–25; 66:1–5). [HS]
- Holladay would be able to respond in his cards and letters to things that HB wrote in cards and letters (Bryan, 59:7–9). [COMM]
- Holladay could carry on a conversation w/HB when she visited him in prison (Bryan, 58:1–2). [COMM/SS]
- No indication that Holladay has a problem differentiating right from wrong (Salekin, 206:14–24). Holladay's former wife, Jackie Morgan, also testified to this (Morgan, 86:1). Furthermore, the nature of Holladay's crime is such that shows premeditation and strategic planning (Ackerson, 245:16–25–247:1–7).

## 5) Results of Scales of Independent Behavior Revised taken by Bobby & David Holladay

- Holladay's personal living skills (i.e., personal hygiene) at age 13 were age-appropriate (D. Holladay SIB–R)
- Holladay's community living skills at age 17 were on the level of 11 years, 3 months (B. Holladay, SIB–R).
- Holladay's overall functional independence at age 13 was on the level of age 7 years, 8 months (D. Holladay SIB–R)
- Holladay's motor skills at age 13 were on the level of age 7 years, 1 month (D. Holladay SIB–R)
- Holladay's social interaction/communication skills at age 13 were on the level of age 5 years, 9 months (D. Holladay SIB–R)
- Holladay's community living skills (e.g., time and punctuality; money and value; work skills; and home/community orientation) at age 13 were on the level of age 7 years, 5 months (D. Holladay SIB–R).
- Holladay's functional dependence at age 17 was on the level of age 9 years and 9 months (B. Holladay, SIB–R).
- Holladay's motor skills at age 17 were on the level of age 5 years, 8 months (B. Holladay, SIB–R).
- Holladay's social interaction/communication skills at age 17 were on the level of age 8 years, 8 months (B. Holladay, SIB–R).

In the inevitable appeal, the parties may wish to state additional evidence and how the evidence should be categorized.

Attached as Exhibit "A" is a form prepared by Dr. Salekin referencing Petitioner's work history.

### Expert Witnesses

No issue of qualifications of the expert witnesses has been raised by the parties. Mental retardation is not a mental illness. Ellis and Luckasson, *supra* n. 9, at 415, n. 6 ("[a]lthough some psychiatrists and a somewhat larger number of psychologists work with people who are mentally retarded, most members of these professions have no experience and little training in the area of retardation"). "Judgments represent both the best and worst of assessment data. Judgments made by conscientious, capable, and objective individuals can be an invaluable aid in the assessment process. Inaccurate, biased, subjective judgment can be misleading at best and harmful at worst." AAMR, *supra* at 94. The curriculum vitae of the two experts here do not reflect substantial training or experience in the mental retardation area. The single reference to mental retardation in Dr. Ackerson's vitae is that she was once employed by the Alabama Department of Mental Health/Retardation Regional Outpatient Examiner for Jefferson County courts as a certified forensic examiner. There is no statement that any of her work there related to mental retardation.

Dr. Salekin's vitae references to retardation include:

(1) Site Coordinator, National Standardization of the Stanford–Binet Intelligence May 2001 through June 2002. This included fairly extensive work involving SB5.[18]

(2) A presentation in March 2004 on *Mental Retardation: Implications for Forensic Psychologists* to the American Psychology Law Society.

Although not specifically related to mental retardation, Dr. Salekin's vitae reflects

---

**18.** This creates a reasonable inference that the IQ test administered by Dr. Salekin was properly done.

substantial experience and writings in the area of mental health malingering.[19] At least "on paper," Dr. Salekin's experience and prolific publications are more extensive and impressive than those of Dr. Ackerson, who has had but one publication. Dr. Salekin's witness experience regarding mental retardation is more extensive ("[a]pproximately 20 of her prior assessments involved only the question of mental retardation") than that of Dr. Ackerson who "could not nail ... down how many involved the specific question of mental retardation..." There is certainly reason to believe that Dr. Salekin's qualifications in the mental retardation field are at least equal to, if not greater, than those of Dr. Ackerson. This court deems them to be greater.[20]

### Conclusions of the Court [21]

#### Alabama Law

■ Notwithstanding the quote from *Atkins* as to "70 to 75," Alabama case law suggests that the IQ for mentally retarded is 70 or below. *See Ex Parte Perkins,* 851 So.2d 453, 456 (Ala.2002). *Also see Ex Parte Smith,* 2003 WL 1145475 (Ala.

Mar.14, 2003); *Stallworth v. Alabama,* 868 So.2d 1128 (Ala.Crim.App.2001). The *Atkins* and AAMR standards are otherwise applicable to Alabama. This court is of the opinion that particular Alabama cases which discuss the sufficiency of evidence with regard to adaptive behavior and functioning in those cases are not controlling here. For example, this case is entirely different from that in *Ex Parte Perkins, supra,* where the defendant, while imprisoned, had earned a GED certificate and completed community college courses, and tested at a full score IQ of 76. Perkins worked for a short time as an electrician. In considering Alabama cases, it should be determined whether there were any substantially disputed expert opinions and if there is other distinguishing evidence.

#### Origination Before Age 18

■ There is no real question that, whatever mental deficiencies the Petitioner has, they are significant and began before he was 18. That is substantiated by his early significant academic problems, his IQ testing, the observations of school officials, etc. This court concludes that Petitioner

19. This creates a reasonable inference that she would have recognized malingering by the Petitioner. The Respondent has criticized Dr. Salekin for not administering a malingering test. Dr. Ackerson did not test at all.

20. By virtue of her regularly giving reports regarding competency and capacity of criminal defendants to this court, Dr. Ackerson may be better known to the court. She was appointed in this case by the magistrate judge.

The magistrate judge stated, " [M]easurements of particular levels of adaptive functioning have always been and continue to be largely a matter of clinical judgment." (Report and Recommendation at 32). This court deems Dr. Salekin's judgment in this area to be better than that of Dr. Ackerson.

21. The court assumes and decides that the Petitioner has the burden of proof by a preponderance of the evidence not only with

regard to IQ (intellectual functioning) and onset age, but also as to related limitations in the adaptive skill areas. A good argument could perhaps be made that proof of subaverage intellectual functioning should shift the burden to the Respondent to prove absence of limitations in the adaptive skill areas. At the state court trial, the court instructed the jury that, "When the factual existence is offered mitigating circumstances are in dispute (sic), the state shall have the burden of disproving the factual existence by a preponderance of the evidence." (R–1762). The *Atkins* majority noted that "reliance on mental retardation as a mitigating factor can be a two-edged sword that may enhance the likelihood that the aggravating factor of future dangerousness will be found by the jury." 536 U.S. at 321, 122 S.Ct. 2242.

has proved that element by more than a preponderance of the evidence.

### Significant Limitations (Sub–Average) in Intellectual Functioning (IQ)

█ Notwithstanding Dr. Ackerson's rejection, without further testing, of a number of IQ tests beginning with the Petitioner's early school years, this court concludes that the Petitioner has proved by a preponderance of the evidence that he has had, since before age 18, significantly subaverage intellectual functioning as established by a series of tests reflecting an IQ of 70 or below, and other evidence. In *In re Holladay*, 331 F.3d at 1174–75, the court noted that Petitioner "has scored as follows: 49 (1958); 56 (1958); 54 (1963); 66 (1968); 73 (1969); 69 (1978); 68 (1979); 72 (1979); 71 (1987); 65 (1991). The mean of these ten scores is 64." After this Eleventh Circuit opinion, Dr. Salekin tested Petitioner at 58. The overwhelming substantial evidence is that

he has had since before age 18 an IQ of less than 70. This was apparently rejected by Dr. Ackerson and the magistrate judge based primarily on their perception of inconsistency in the test scores.

Dr. Ackerson's dismissal of the earlier IQ tests based upon inconsistencies is not supported by any citation of independent authority by her or by the magistrate judge. Dr. Ackerson acknowledged that "I *don't know* how they [the tests] were administered. *I don't know* how much effort Mr. Holladay put forth on the particular test, which is the main concern that I have . . ." (emphasis added). This would suggest that further testing by Dr. Ackerson was called for. There is substantial preponderant evidence of an IQ of 70 or below. The test administered by Dr. Salekin is the latest substantiation.[22] It is significant that, prior to *Atkins*, both the prosecutor and the sentencing judge acknowledged that the Petitioner was "slightly" mentally retarded. His mother

---

**22.** While both Dr. Ackerson and the magistrate judge somewhat demean the Stanford Binet test, administered by Dr. Salekin, Code of Ala. (2005) § 12–15–90(j)(2) states: "A borderline retarded person is an individual who is functioning between one and two standard deviations below the mean, and the mildly retarded person is an individual who is functioning between two and three standard deviations below the mean on a standardized intelligence test such as the Stanford Binet scale and measures of adaptive behavior such as the American Adaptive Behavior scale." Again, Dr. Salekin's resume indicates special experience in this area.

During the ten times that Petitioner has been tested over the years, all of the tests, except the recent one by Dr. Salekin, have been by a version of the WAIS (the test favored by the magistrate judge.) There is no evidence that the SB–5 test was not appropriately administered and scored by Dr. Salekin. Neither Dr. Ackerson nor the magistrate judge purport to suggest how the tests at issue were improperly administered nor how the Petitioner, particularly at age nine, maling-

ered. In *Hodges v. Barnhart*, 276 F.3d at 1268–69, the court stated:

Acknowledging the lack of IQ evidence before age twenty-two, Hodges asserts that absent evidence of sudden trauma that can cause retardation, the IQ tests create a rebuttable presumption of a fairly consistent IQ throughout her life. We agree. Other appellate courts have recognized this presumption finding that IQ's remain fairly constant throughout life. *See Muncy v. Apfel*, 247 F.3d 728, 734 (8th Cir.2001) ("Mental retardation is not normally a condition that improves as an affected person ages . . . Rather, a person's IQ is presumed to remain stable over time in the absence of any evidence of a change in a claimant's intellectual functioning."); *Luckey v. U.S. Dept. Of Health & Human Servs.*, 890 F.2d 666, 668 (4th Cir.1989) (holding absence of IQ test in developmental years did not preclude finding of mental retardation predating age twenty-two and courts should assume an IQ remained constant absent evidence indicating change in intellectual functioning).

referred to him as "retarded." [23] This court notes that the term "slightly" is not a term of art in the mental retardation area. Since the term "borderline retarded" is no longer appropriate, a person is either "mildly" retarded or more severely retarded, if retarded at all. The fact that the Petitioner has been examined for cognitive intellectual purposes ten times during a period mostly exclusive of his last incarceration suggests a continuing concern in this area by school officials and others.

### Adaptive Behavior Functioning

■ The two experts agreed that the Petitioner has substantial adaptive deficiencies with regard to academics. Thus, a remaining question is whether the Petitioner has substantial adaptive deficiencies with regard to any of the other ten factors. This court is satisfied that the defendant has proved by a preponderance of the evidence that he has such deficiencies in several areas.

■ The evidence is overwhelming that the Petitioner has never done and has never been capable of doing any more than menial work tasks. His "work" has been infrequent, requiring little or no skills. The mere fact that a mildly mentally retarded person is "capable of regular (competitive) employment, typically in unskilled jobs," does not create a reasonable inference that the person is not mildly mentally retarded. That is considered to be the norm for mentally retarded persons. Baroff, *supra* n. 9, at 42. The type "work" performed by the Petitioner is entirely consistent with the type work which can be performed by the mentally retarded as described by Professor Baroff. Even that "work" of the Petitioner was almost nonexistent.

■ It is important, in determining whether a person is or is not mentally retarded, not to pick and choose so as to over-emphasize certain characteristics.

Assumption 3: "Within an individual, limitations often coexist with strengths." This means that people with mental retardation are complex human beings who likely have certain gifts as well as limitations. Like all people, they often do some things better than other things. Individuals may have capabilities and strengths that are independent of their mental retardation. These may include strengths in social or physical capabilities, strengths in some adaptive skill areas, or strengths in one aspect of an adaptive skill in which they otherwise show an overall limitation. AAMR, *supra* at 8.

AAMR at 104 states: "F70 *Mild mental retardation.* Approximate IQ range of 50 to 69 (in adults mental age from 9 to under 12 years). Likely to result in some learning difficulties in school. Many adults will be able to work and maintain good social relationships and contribute to society." While even these characteristics do not foreclose a mental retardation determination, Petitioner has not adapted in any of these ways.

Dr. Ackerson agreed that Holladay showed limitations in adaptive functioning as an adult, but believed that ".... some of these limitations, all of these limitations, can *also* be explained in terms of illiteracy, poor experience at school, and also the fact that he was incarcerated for so much in his early adulthood." (Tr–369). The real issue is whether a person with an IQ of below 70 has adapted. It is apparent that Petitioner did not. The key to adaptive behavior is the type support that the indi-

---

**23.** "During his school years (which lasted until the sixth grade), Holladay was frequently referred to as slightly mentally retarded or a 'slow learner.' " *In re Holladay,* 331 F.3d at 1175.

vidual has received. Where, as here, the individual has had little or no support, the likelihood of adapting is slight, if existent. Dr. Ackerson tends to look upon inappropriate conduct as something separate from mental retardation, rather than as indicating a lack of support which has impeded adaptation. Attached as Exhibit B is Richard J. Bonnie, *The American Psychiatric Association's Resource Document on Capital Sentencing: Implementing Atkins v. Virginia,* Journal of the American Academy of Psychiatry and the Law 32: 304–8 (2004). This court has highlighted particularly pertinent statements which suggest that emphasis by the State on Petitioner's criminal record is misplaced.

There are several areas where this court believes Dr. Ackerson's analysis has proved to be highly questionable. The first, as has been mentioned, is her decision to rely on a somewhat conclusory determination of no mental retardation rather than to administer further testing. When Dr. Ackerson was asked what professional publication she could refer to for her method of examination, she replied, "It's standard practice. If somebody comes to me and it's obvious they're not mentally retarded, it is not necessary for me to give an IQ test." (Tr. 467).[24] To the contrary, *see* Ellis and Luckasson, *supra* n. 9, at 484–489. ("In all cases where the defendant is suspected of being mentally retarded,[25] an individual intelligence test should be administered in order to

formulate an estimate of the defendant's general intellectual functions. Even if a defendant has had IQ tests in the past, a new examination should almost always be conducted in order to provide a comparison to the older test results." *Id.* at 488.) Since the issue is whether the Petitioner is presently mentally retarded, it would appear that a contemporary IQ test provides the most significant proof of sub-average intellectual functioning.

Dr. Ackerson's adaptive functioning analysis raises further questions. Dr. Ackerson somewhat suggests that the Petitioner's condition is explained by his home environment and treatment rather than mental retardation. The two are not mutually exclusive. "With *appropriate personalized supports* over a sustained period, the life functioning of the person with mental retardation will generally improve…[i]mprovement in functioning should be expected *from appropriate supports,* except in rare cases." AAMR, *supra,* at 9 (emphasis added). The failure of the Petitioner to improve in the adaptive behavior area may well be explained by the lack of support, home support or otherwise. There is no evidence that the Petitioner ever had any of the "supports" deemed so important in the AAMR publication *Mental Retardation* (10th ed.).[26] The need for supports as a positive influence is recognized in this text at page 25:

The 1992 definition placed an added emphasis on assessing a person's current

---

**24.** Dr. Salekin met with and interviewed the Petitioner for two full days plus two additional hours on a third day. Dr. Ackerson interviewed him for "four to five hours."

**25.** The Eleventh Circuit observed in *In re Holladay* that "[i]n this case, we already have held that there is a reasonable likelihood that Holladay is mentally retarded…" 331 F.3d at 1177. This statement apparently applies to all three elements of the definition of mental retardation. This court recognizes, of course, that this was not a ruling on the merits.

**26.** The magistrate judge's Report and Recommendation has *no* discussion regarding the supports or lack of supports received by the Petitioner. At one place Dr. Ackerson even seems to suggest that a finding of lack of support is an alternative to a finding of mental retardation rather than an explanation of lack of adaptation. *See* quote in Report and Recommendation at 42.

functioning given the impact of changing environmental demands and supports. The definition's assumptions stated that improvements in environmental conditions or the presence of needed supports could positively impact an individual's ability to meet the routine demands of life, thereby improving his or her performance on adaptive skill measures; as a result, the life functioning of the person might improve and, in rare cases, the diagnosis of mental retardation might no longer apply.

It is obvious that negative influences such as parental physical abuse, excessive drinking of alcohol, etc. can have a negative effect. It may be that the Petitioner's condition was contributed to by his mother drinking alcohol during pregnancy and was exacerbated by his home life, including his mother's conduct and abuse from his father. "[S]trong evidence exists that a person who was abused as a child is at risk of suffering long-term effects that may contribute to his violent behavior as an adult." Phyllis L. Crocker, *Child Abuse and Adult Murder*, 77 N.C. L.Rev. 1143, 1158 (1999). There is no reason to believe that such abuse would not have an adverse impact on a mentally retarded person. It may be even more significant as to a mentally retarded person because it could affect his adaptive functioning in general.[27]

The magistrate judge at least partially summed up his acceptance of Dr. Ackerson's opinion and his rejection of Dr. Salekin's as follows:

With regard to the major disagreements between the experts as to adaptive functioning, Dr. Salekin asserted that Holladay's deficits were indicative of mental retardation, and Dr. Ackerson opined that Holladay's deficits were indicative of willful and anti-social behavior. As will be discussed later herein, the court finds that Dr. Ackerson's explanations are well-reasoned and better supported by the record than Dr. Salekin's view. Thus, the court credits Dr. Ackerson's assessment of Holladay's functioning as borderline intellectual, given all of the information ..., including the IQ results, [and] his functioning overall ... (Tr. 354). (Report and Recommendation at 35).

This court rejects the argument that willful and/anti-social behavior excludes a mental retardation determination. To the contrary, it suggests that a person whose IQ tests strongly indicate mental retardation has not adapted.

*Atkins* recognizes that "mentally retarded persons frequently know the difference between right and wrong and are competent to stand trial. Because of their impairments, however, by definition they have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others." *Atkins*, 536 U.S. at 318, 122 S.Ct. 2242. The magistrate

---

**27.** At the trial, Petitioner's father testified that the Petitioner was beaten at foster homes (R 1692); that his mother was a chronic alcoholic (R 1690); that he was a slow learner (R 1696); that he was married three times (each for a short period) (R1700–01); that he broke both legs trying to escape from jail (R 1703); and that he crawled in his own "dung" while in jail (R 1704–05). David Holladay confirmed the foster home abuses (R 1716). Both the father and David Holladay testified that Petitioner became mean and violent. Holladay's mother drank frequently when she believed she was pregnant. (Report and Recommendation page 45). "The record is replete with reports of Mr. Holladay beating the children." *Id.* at 46. The trial court found "that as a child the Defendant was abused and neglected." (State record at 128). Testimonial references are to the state trial transcript.

judge, in a somewhat conclusory manner, stated, "Other indications that Holladay, as an adult, possessed adaptive function skills beyond the merely retarded range were documentary evidence of the events leading up to the 1986 murder. . ." (Report and Recommendation at 76–77). This court is at a loss to see which of the ten factors this bears on. It would appear that such criminal conduct would indicate at least social limitations. It is doubtful that it bolsters any other factor. The main legal/medical issue in this case may be whether the ability to commit a crime and temporarily avoid capture forecloses a determination of mental retardation.[28]

It would appear that a person who has attained adaptive behavior or functioning would have to adjust to society in some positive way. The Petitioner has not. He has never exhibited any significant skills in the areas of communication, social skills, community use, functional academics or work. To the contrary, he has significant and substantial deficits in adaptive behavior in all these areas and, arguably, in other areas as well.[29] The Petitioner's attitude toward women and animals regarding sex, his "peeping," and his general criminal conduct do not reflect social adaptation. At the state court trial, the prosecutor continually made a point of the fact that the Petitioner's home life was no

worse than that of his siblings and others in his neighborhood. This may serve to show that the Petitioner, who has been determined to have sub-average intelligence, did not "adapt."

It has been suggested that the Petitioner's long term of imprisonment would somehow interfere with the determination of whether he is presently mentally retarded. It seems clear, however, that the incarceration would not have improved his condition in any way. See discussion in Ellis and Luckasson, *supra* n. 9, at 479–484. There is no evidence of any habilitation.

Dr. Ackerson, again somewhat in a conclusory manner, attributes the Petitioner's history of working only the most menial of jobs, his poor academic performance, and his anti-social behavior to an anti-social personality disorder. She acknowledged, however, that anti-social behaviors and mental retardation are not mutually exclusive and that such disorders could be a function of mental retardation.

■ In deciding an issue such as this, a judge has to avoid any consideration of personal attitude about the death penalty, any personal attitude about the *Atkins* case and any undue personal attitude about the heinous nature of the offenses committed.[30] In this case, there seems

---

**28.** The State has repeatedly referred to Petitioner's crimes as "complicated." Apparently he came to harm, even kill, his ex-wife and killed all who were present. It was not "complicated." It was, perhaps, at least partly impulsive. The Respondent refers to Petitioner's "criminal acumen." He always got caught.

**29.** The 2002 AAMR apparently changed the adaptive skill areas to "conceptual, social, and practical." This court finds that the Petitioner has not "adapted" in any of these areas. He does not seem to have any positive skills. The evidence may suggest that the Petitioner has some practical skills. Even these "skills" are based on pick and choose

evidence. It does not suggest that he has conceptual or social skills. Further, there is no reasonable inference that he has ever had the type of supports required to develop adaptive skills.

**30.** In their *Atkins* dissents, both Chief Justice Rehnquist and Justice Scalia decried the majority's subjectivity. It would be rank hypocrisy for any court to subjectively evade the majority holding. Justice Scalia's dissent provides a good insight to the majority holding. He condemns the majority opinion because it allows those who commit heinous and depraved crimes to avoid the death penalty. He protested that Atkins, who had sixteen prior violent felony convictions and then

little doubt that if the Petitioner and his history had been examined before the date of his subject offenses, a finding of mental retardation would have been made. The only basis for a different conclusion now would be if the Petitioner's extremely violent conduct and his later temporary avoidance of capture forecloses a determination of mental retardation. This court does not conclude that it does.[31]

This court's ultimate decision in this case should indicate its responses to the Petitioner's objections. The court specifically notes the following:

(1) This court agrees that more weight should have been given to the 1958 IQ scores of 49 and 56 (as well as other scores);

(2) This court does not agree that the opinion of Dr. Ackerson that the Petitioner is not mentally retarded is better supported than Dr. Salekin's opinion that he is mentally retarded.

■ The court ultimately concludes that the Petitioner has proved by a preponderance of the evidence that he is, and has been since before age eighteen, mentally retarded as determined under Alabama law. This conclusion is based on, at least, findings of fact that:

(1) Petitioner has an IQ level of below 70 and has significantly sub-average intellectual functioning.

(2) Said sub-average intellectual functioning has and does exist concurrently with related limitations in the following adaptive skill areas: communication, social skills, community use, self-direction, health and safety, functional academics, conceptual skills, and work; and,

(3) The onset of the aforesaid conditions occurred before Petitioner was 18 years of age.

As earlier indicated, the court in *In re Holladay* stated, "In this case, we already have held that there is a reasonable likelihood that Holladay is mentally retarded ..." 331 F.3d at 1177. This court takes that holding one step further and finds based on a preponderance of the evidence that the Petitioner has been prior to age 18, and is now, mentally retarded.

This court has made an effort to consider the evidence objectively. One could reasonably argue that decisions as to whether a person is or is not mentally retarded should be left to the consensus of a group of independent experts rather than by judges weighing expert opinions and considering other evidence. Maybe

shot his latest victim eight times could escape the death penalty. This court is bound by the majority opinion, no matter how evil the Petitioner's crime was. Disputes are likely to continue to arise regarding whether state law holdings that the ability to plan and commit crimes avoids findings of mental retardation. Such holdings may be a circular evasion of the *Atkins* majority opinion. *See Clemons v. State,* 2005 WL 1492023 (Ala.Crim.App. June 24, 2005), where the pertinent part of the court's opinion primarily quotes the trial court's order and then adopts its findings without discussion of the legal issues. If such defendants have "adapted," query, to what? *See* Exhibit B. It is likely that any defendant who is convicted of capital murder has committed a heinous crime. Neither *Atkins* nor *In re Holladay* suggest that such crimes ren-

der a defendant ineligible for exemption from the death penalty based on mental retardation.

31. In *Rivera, supra* n. 1, the court stated, "[t]he underlying crime for which Rivera was given the death penalty is one of the most senseless and brutal crimes that this Court has ever encountered." *Id.* at 47. The Respondent has made substantial reference to Texas law that is not applicable here. Texas law appears to be more restrictive than Alabama law. Regardless, *Rivera* found that Rivera was mentally retarded on evidence less convincing than that in this case. This court recommends a full reading of *Rivera*. A comparison of some of the arguments made by the state in *Rivera* with those of the State in this case suggest expediency.

such a process could be available at the appellate level.

Within ten (10) days the Petitioner will file and serve a proposed final judgment.[32] The Respondent will have ten (10) days thereafter to object as to matters of remedy and form.

### FINAL JUDGMENT

This cause comes before the court on the Petition for Writ of Habeas Corpus filed on behalf of Glenn William Holladay on June 4, 2003. This court, having filed "Findings of Fact and Conclusions of Law" on October 12, 2006 concluding that the Petitioner is mentally retarded and therefore exempt from execution pursuant to *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), hereby GRANTS the Petition for Writ of Habeas Corpus and permanently ENJOINS Donal Campbell, Commissioner of the Alabama Department of Corrections, and his successors, and the State of Alabama from executing the Petitioner.[1]

It is further ORDERED, ADJUDGED, and DECREED that this court's writ of habeas corpus ISSUES on the condition that, if the Petitioner is resentenced without the imposition of the death penalty within sixty days from this date, the said writ will be moot. Failing the condition stated herein, Petitioner's sentence will be vacated and he shall be freed of all restraints imposed by the sentence dated July 27, 1987. In the event of a timely appeal from this Final Judgment, this writ as to resentencing will be stayed pending a final resolution of said appeal. The permanent injunction will not be stayed by this court pending resolution of any such appeal.

The Clerk will mail a copy of the said Findings of Fact and Conclusions of Law and this Final Judgment to the Clerk of the Supreme Court of Alabama and to the Clerk of the Circuit Court of Etowah County, Alabama.

---

**32.** *See* remand directions at the conclusion of *Borden v. State*, 2005 Ala.Crim.App. LEXIS 11, at *7 (Ala.Crim.App. Jan. 7, 2005).

**1.** The court's Findings of Fact and Conclusions of Law include determinations that there is, *inter alia*, preponderant proof of (1) Eleven IQ tests starting at age nine, with an average score of 64, that are, along with other evidence, overwhelmingly convincing of subaverage intellectual functioning, notwithstanding conclusory statements by one expert who rejected the significance of the tests without a) evidence for questioning the manner in which the tests were administered, b) evidence of hinted-at malingering, or c) further testing; (2) Significant limitations in adaptive functioning in the skill areas listed by the American Association on Mental Retardation and endorsed by the Supreme Court of Alabama (as well as by both parties' experts), without evidence of any supports which might have led to a reduction of such limitations; and (3) Unquestionable onset of the condition prior to age eighteen.