[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

_____

No. 06-16026

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JAN 30, 2009
THOMAS K. KAHN
CLERK

D. C. Docket No. 03-01323-CV-RBP-HGD

GLENN WILLIAM HOLLADAY,

Petitioner-Appellee,

versus

RICHARD F. ALLEN, Commissioner,
Alabama Department of Corrections,

Respondent-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

(January 30, 2009)

Before TJOFLAT, ANDERSON and MARCUS, Circuit Judges.

ANDERSON, Circuit Judge:

Glenn Holladay appears before this Court for the third time. This time, however, he appears as the Appellee. In 2000, we affirmed the district court's denial of his petition for writ of habeas corpus, see Holladay v. Haley, 209 F.3d

1243 (11th Cir. 2000), rejecting claims of ineffective assistance of counsel. Next, Holladay appealed to this court for permission to file a second habeas petition and stay of execution, in light of the Supreme Court's decision in Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242 (2002), which held it unconstitutional to execute the mentally retarded. We granted Holladay's request, stating that we were not holding that Holladay was mentally retarded: "[r]ather we simply hold today that based on the facts presented and the procedural posture of this case petitioner should be permitted to file a second petition for a writ of habeas corpus on the basis of his Atkins claim." In re: Holladay, 331 F.3d 1169, 1176 (11th Cir. 2003). Holladay prevailed in that second habeas petition when the district court found that he proved by a preponderance of the evidence that he was mentally retarded. Holladay v. Campbell, 463 F.Supp.2d 1324 (N.D. Ala. 2006). Now the State of Alabama appeals this decision of the district court.[1]

---

[1]     The district court held that the State of Alabama affirmatively waived exhaustion of this issue. See 28 U.S.C. §2254(b)(3) ("A State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waived the requirement."). The district court also held that Holladay's presentation of this issue to the district court was not the subject of any procedural bar. For these reasons, and because the issue was never litigated in the state courts, the district court resolved the issue – after evidentiary hearings first before the magistrate judge and then before the district judge – according no deference to any decision of the state courts. In this appeal, the State of Alabama asserts no challenge to the district court's decisions with respect to exhaustion, procedural bar, holding of evidentiary hearings in federal court, or deference. Accordingly, any such challenge is deemed abandoned, and we proceed to entertain the merits of this issue on appeal according no deference to any state court decision on the issue.

## I.  BACKGROUND

Holladay was convicted of capital murder and sentenced to death on July 27, 1987.[2]  The Alabama Court of Criminal Appeals and the Alabama Supreme Court affirmed both his conviction and death sentence on direct appeal.  Holladay v. State, 549 So.2d 122 (Ala. Crim. App. 1988), aff'd, Ex parte Holladay, 549 So.2d 135 (Ala. 1989).  The United States Supreme Court denied Holladay's petition for writ of certiorari,  Holladay v. Alabama, 493 U.S. 1012, 110 S.Ct. 575 (1989), and his petition for rehearing, Holladay v. Alabama, 493 U.S. 1095, 110 S.Ct. 1173 (1990).

Next, Holladay filed for post-conviction relief under Temporary Rule 20[3] of the Alabama Rules of Criminal Procedure on September 10, 1990, and amended his petition on April 24, 1991.  An evidentiary hearing was held on April 25-27, 1991, and on December 5, 1991, the Rule 20 court denied the petition, finding some of the claims procedurally barred and determining that the others were meritless.  The Alabama Court of Criminal Appeals affirmed the denial and the Alabama Supreme Court denied his petition for writ of certiorari.  Holladay v. State, 629 So.2d 673

---

[2]  The facts of the murders can be found in our previous opinion, Holladay v. Haley, 209 F.3d 1243 (11th Cir. 2000).

[3]  Rule 20 has since been finalized as Rule 32 of the Alabama Rules of Criminal Procedure.

(Ala. Crim. App. 1992), <u>cert</u>. <u>denied</u>, 629 So.2d 673 (Ala. 1993).  The United States Supreme Court denied his petition for writ of certiorari.  <u>Holladay v. Alabama</u>, 510 U.S. 1171, 114 S. Ct. 1208 (1994).

Holladay filed his initial petition for writ of habeas corpus with the district court in 1995 and it was denied in 1998.  We affirmed.  However, after the Supreme Court, in its 2002 <u>Atkins</u> decision, announced the new rule that it would be unconstitutional to execute someone who was mentally retarded, we held that the rule had been made retroactive to cases on collateral review by the Supreme Court.  <u>Holladay</u>, 331 F.3d at 1172.   Thus we granted Holladay permission to file a second habeas corpus petition.  On remand, the magistrate judge held an evidentiary hearing; he heard evidence from Holladay's brother, David Holladay; his childhood acquaintance, Helen Bryan; a former death row guard, Raymond Fuqua; and Holladay's ex-wife, Jackie Morgan; the court-appointed mental health expert, Dr. Kimberly Ackerson; and Holladay's mental health expert, Dr. Karen Salekin.

David Holladay was the first to testify and he recounted a childhood of watching his older brother struggle with basic tasks.  Glenn Holladay, David testified, could not read, could not work as a painter, could only cook eggs, and mostly kept to himself as a child.  Glenn could drive a car but used landmarks to

4

navigate. The few jobs that Glenn held were manual labor positions, and even in those, he could not always perform to the satisfaction of his employers or co-workers.

Next to testify was Helen Bryan, Holladay's former neighbor and childhood acquaintance (who was ten years younger than Holladay). She stated that Holladay was slow and would often play with the younger children rather than his peers. She also testified that she witnessed Holladay running from the police with a big smile on his face, as if it were a game. Later, she testified, he stated to her mother and her that he felt more comfortable in jail than out.

After Helen Bryan, Holladay called Raymond Fuqua, who had guarded Holladay on death row for about ten years. Fuqua testified that Holladay is a friendly but "slow or special needs" inmate, who has a few friends. Holladay had been eager to work as a runner on death row but complaints from other inmates about Holladay's hygiene ended his assignment. Fuqua testified that Holladay once administered an enema to himself and made a large mess when he failed to reach the toilet in time. Fuqua was struck by the fact that Holladay did not seem embarrassed by the situation and that Holladay was unable to clean up the mess, although he was otherwise able to keep his cell clean. Finally, Fuqua testified that Holladay was a diabetic and was able to administer blood sugar tests to himself.

The final non-expert witness called was Holladay's former wife, Jackie Morgan. Morgan testified that Holladay coerced her into marriage through threats to kill her and her family; that he married her merely for a place to stay and her car; that he regularly threatened and beat her; that he could print, cook whatever he wanted, and use the phone; and that Holladay merely stole and did not work during their marriage. She also testified that she believed he had killed another person.

Most of the testimony at the hearing came from the two expert witnesses, Drs. Karen Salekin and Kimberly Ackerson. Dr. Salekin had been hired by Holladay to evaluate him while Dr. Ackerson had been appointed by the magistrate judge.

Dr. Salekin testified extensively about her lengthy interview with Holladay, her discussions with others who knew Holladay, and her review of the record. Dr. Salekin administered several tests to Holladay, including the Stanford-Binet-5 IQ test, which she chose over Wechsler Adult Intelligence Scale ("WAIS") because the Stanford-Binet had been normed (updated) more recently.[4] She also preferred the Stanford-Binet because of the theoretical basis upon which it is based and her

---

[4] Dr. Salekin explained that IQ scores have been increasing over time – the Flynn Effect – and so IQ tests must be recalibrated to reflect the rising scores. She stated that the WAIS was 15 years past its norming cycle which results in elevated scores, while the Stanford-Binet was normed in 2003.

6

experience as a site coordinator for the Stanford-Binet-5 normalization. The other tests she administered to Holladay were the Mini-Mental Status Exam, which is a general orientation instrument, and the Woodcock-Johnson test, which is a test of academic subject matter. Additionally, she administered the Scales of Independent Behavior Revised to Holladay's two brothers. This test measures the adaptive functioning of the subject – in this case Holladay – by asking those who observe him regularly about his ability to function in the home, school, employment, and community. Dr. Salekin conceded that it was unorthodox to administer the test to the brothers based upon their memory of Glenn before the age of eighteen. In other words, although the test is designed to be administered to persons who know the subject (and not the subject himself), the test is designed to be administered contemporaneously, and not based on memories of the subject's abilities. However, Dr. Salekin explained her decision to use the test this way was because the criteria for mental retardation requires the defendant to be mentally retarded before the age of eighteen. It would be inaccurate to use current observers of Holladay because his environment is so restricted that one could not get a proper breadth of understanding of his abilities.

In her preparation, Dr. Salekin spoke to two of Holladay's brothers, two of his sisters, four correctional officers, a prison psychologist, a prison nurse,

7

Holladay's former attorney, one of Holladay's friends, and a fellow death row inmate. Although she attempted to talk to Holladay's ex-wives, she could not locate one and the other, Jackie Morgan, refused to speak to her. Her interviews with Holladay spanned two full days and several hours on the third.

Based on her evaluation of DHR records, school and other records,[5] Holladay's test scores, her interviews with those who know Holladay and her interview with Holladay himself, Dr. Salekin determined that Holladay was mentally retarded. She noted that on the IQ test that she administered, Holladay had scored a 58. While allowing that his score would have naturally declined because of his age and incarceration, she testified that it was consistent with his past scores, which averaged below the threshold for mental retardation in Alabama of 70. She also pointed to his lack of adaptive functioning in several areas: employment, health and safety, self-direction, social and interpersonal skills, and education. Her information on these subjects was gleaned from her interviews, the DHR records, and trial and deposition testimony.

---

[5] In her report, Dr. Salekin discussed the findings of Dr. Norko and Dr. Fisher, a psychiatrist and a psychologist who testified that they thought Holladay was mentally retarded during the Rule 20 proceedings in support of his argument that he received ineffective assistance of counsel. She did not, however, discuss the findings of Dr. Dixon, a psychologist who testified that he did not think that Holladay was mentally retarded, because she thought he did not administer proper tests and because Dr. Dixon admitted in testimony that his evaluation was just to confirm that Holladay was not mentally retarded; such an admission, she testified, showed a bias.

By contrast, Dr. Ackerson testified that she did not think that Holladay was mentally retarded. In preparing her report, Dr. Ackerson interviewed three law enforcement officers; Holladay's former wife, Jackie Morgan; and Jackie Morgan's son, Jerry. Dr. Ackerson's impression of Holladay was quite different than Dr. Salekin's: Dr. Ackerson found him to be socially appropriate and able to answer questions appropriately. After reviewing the records and meeting with him for about five hours, Dr. Ackerson determined that it was not necessary to administer an IQ test. She testified that she believed that the score would be low but that she thought it was the result of other factors, such as a learning disability[6] and his chaotic home life. She discounted his adult test scores because of the lack of consistency in his scores, which she thought was not reflective of a person with mental retardation. Dr. Ackerson also pointed to Holladay's planning and carrying out of the murders and ability to elude law enforcement for several months after the murders as evidence of his adaptive skills that were inconsistent with mental

---

[6] The regulations for Public Law (P.L.) 101-476, the Individuals with Disabilities Education Act (IDEA), formerly P.L. 94-142, the Education of the Handicapped Act (EHA), define a learning disability as a "disorder in one or more of the basic psychological processes involved in understanding or in using spoken or written language, which may manifest itself in an imperfect ability to listen, think, speak, read, write, spell or to do mathematical calculations." 34 C.F.R. § 300.8 (c)(10)(i). According to the regulations, learning disabilities do not include learning problems that are primarily the result of visual, hearing, or motor disabilities; mental retardation; or environmental,cultural, or economic disadvantage. § 300.8 (c)(10)(ii).

9

retardation. Similarly, she cited incidents in the DHR records to support her opinion that he had adaptive skills as a child.

The magistrate judge credited Dr. Ackerson's testimony over Dr. Salekin's. The magistrate judge found the reasons Dr. Ackerson gave for Holladay's cognitive deficits shown on the IQ tests to be well-reasoned and better supported than those given by Dr. Salekin. As part of this analysis, Dr. Ackerson pointed to the lack of consistency on the component parts of the IQ tests. Additionally, the magistrate judge found Dr. Salekin's assessment of Holladay's adaptive functioning ignored the abilities that he showed, especially when he was on the run after the murders. Detailing the records of his youth, the magistrate judge accepted Dr. Ackerson's view that Holladay's problems in school and low IQ scores were more linked to his chaotic homelife and anti-social personality rather than organic mental deficits. Ultimately, the magistrate judge concluded that Holladay had not shown by a preponderance of the evidence that he was mentally retarded.

Holladay appealed the magistrate judge's recommendation. The district court held a supplementary evidentiary hearing in which he heard testimony from the two expert witnesses. The district court asked extensive questions about certain testimony the witnesses had given at the first hearing and permitted questions by the parties.

Several months later, the district court issued its opinion disagreeing with the magistrate judge and finding that Holladay had shown by a preponderance of the evidence that he was mentally retarded. The court listed all of the facts that supported a determination that Holladay was retarded and those that supported the opposite finding. It noted that there was no real dispute that Holladay's mental deficiencies began before he turned eighteen. Next, the court examined the evidence that Holladay had significant limitations in intellectual functioning or, in other words, a qualifyingly low IQ. This, the court found, Holladay had met by a preponderance of the evidence by presenting eleven test scores whose mean was distinctly below 70. The court criticized Dr. Ackerson's approach towards the test results because she rejected their reliability and yet did not test Holladay herself.

Turning to adaptive functioning, the court noted first that both experts agreed that Holladay had substantial deficiencies in academics. Then the court discussed the evidence supporting its finding that Holladay had substantial adaptive deficiencies in work, and stated that it was satisfied that Holladay also had proved that he had deficiencies in other areas.

The court also expressed its dissatisfaction with Dr. Ackerson's analysis of adaptive functioning. Dr. Ackerson had testified that Holladay's condition could be explained by his home environment and treatment rather than mental

11

retardation.  However, the court stated, according to the literature, these things are not mutually exclusive.  The toxic home environment could have been even a more damaging to one with mental retardation.  Holladay, he reasoned, has not adjusted to society, and suffered from significant deficiencies in adaptive behavior, not only in functional academics and work but also in other areas, including social skills and health and safety.

## II.  THE LEGAL STANDARD

In 2002, the Supreme Court held that executing mentally retarded capital offenders violated the Eighth Amendment.  Atkins v. Virginia, 536 U.S. 304, 122 S. Ct. 2242 (2002).  The Court held two important things for our calculus.  First, it noted that "clinical definitions of mental retardation require not only subaverage intellectual functioning, but also significant limitations in adaptive skills."  Id. at 318, 122 S. Ct. at 2250.  Second, the Court left to the states the development of standards for determining when an offender is mentally retarded.  Id. at 317, 122 S. Ct. at 2250.   Thus, this court must examine Alabama's law to determine its standards.  Because the Alabama legislature has not enacted any legislation about how to determine this, we must examine Alabama case law.[7]

_____

[7]     In Smith v. Alabama, __ So.2d __, 2007 WL 1519869 (Ala. May 25, 2007), the Alabama Supreme Court reiterated that the definition of mentally retarded in the capital context should be, but had not yet been, developed by the legislature.

12

Turning to Alabama law, the Alabama Supreme Court has defined the test for mental retardation that rises to the level of prohibiting execution as having three components: (1) significantly subaverage intellectual functioning (i.e., an IQ of 70 or below); (2) significant or substantial deficits in adaptive behavior; and (3) the manifestation of these problems during the defendant's developmental period (i.e., before the defendant reached age eighteen). Smith v. Alabama, __ So.2d __, 2007 WL 1519869, at *8 (Ala. May 25, 2007) (not yet released for publication); Ex Parte Perkins, 851 So.2d 453, 456 (Ala. 2002). According to literature in the field, significant or substantial deficits in adaptive behavior are defined as "concurrent deficits or impairments in present adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health and safety." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 39 (4th ed. 1994). In other words, to satisfy the second prong of the test, the evaluator must find that the defendant has deficiencies in two of those listed areas.

Though the factors state that the problems had to have manifested themselves before the defendant reached the age of eighteen, it is "implicit" that the problems also existed at the time of the crime. Smith, __ So.2d at ___, slip at *8.

13

A diagnosis of borderline intellectual functioning will not qualify for exemption from the death penalty.[8]  Id.

We review the district court's finding that Holladay is mentally retarded for clear error.  Osborne v. Terry, 466 F.3d 1298, 1304 (11th Cir. 2006); see also Rivera v. Quarterman, 505 F.3d 349, 361 (5th Cir. 2007) (applying the clearly erroneous standard to a district court determination that the defendant was mentally retarded).  "Clear error is a highly deferential standard of review."  Holton v. City of Thomasville Sch. Dist., 425 F.3d 1325, 1350 (11th Cir. 2005).  A factual finding is clearly erroneous "'when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'"  Id. (quoting Anderson v. City of Bessemer City, 470 U.S. 564, 573, 105 S. Ct. 1504, 1511 (1985)). In Anderson, the Supreme Court explained that the clear error standard

> plainly does not entitle a reviewing court to reverse the finding of the
> trier of fact simply because it is convinced that it would have decided
> the case differently. . . .  In applying the clearly erroneous standard to
> the findings of a district court sitting without a jury, appellate courts

---

[8]     Alabama's brief on appeal indicated agreement that the foregoing standard for determining mental retardation is the appropriate standard under Alabama case law.  It was the standard utilized by the district court; it is not challenged on appeal.  Alabama does argue that certain Alabama decisions (finding no mental retardation on their facts) are controlling.  However, we agree with the district court that the facts of those Alabama cases are sufficiently different from the instant facts that those decisions do not indicate that the district court erred in this case.

14

must constantly have in mind that their function is not to decide factual issues de novo. If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.

Anderson, 470 U.S. at 573-74, 105 S. Ct. at 1511 (internal citations and quotation marks omitted).

### III. DISCUSSION

#### A. Significantly Subaverage Intellectual Functioning

Holladay has been administered IQ tests ten times, starting when he was nine years old. In 1958, when he was nine, school officials administered the Wechsler Intelligence Scale for Children ("WISC") to Holladay two times. The first time, Holladay scored a Verbal Score of 62 and a Performance Score of 44, for a Full Scale IQ score of 49. Twenty days later, Holladay was administered the test again and this time scored a 75 on the Verbal Scale portion and a 44 on the Performance Scale for a Full Scale IQ of 56. Holladay was administered the WISC once more, in 1963, when he was fourteen, and that time scored a 57 on Verbal Scale and 58 on the Performance Scale, for a Full Scale IQ of 54.

Once he reached nineteen, he was administered the adult version of the test, the Wechler Adult Intelligence Scale ("WAIS"). On this March 1969 test,

15

Holladay received a 66, although the record does not contain the scores for the individual components. About six months later, in November 1969, Holladay again took an IQ test, presumably the WAIS, and this time scored a 73. Upon release from Central State Hospital in Georgia, where these tests were administered, his discharge diagnosis was "Mild mental retardation." The staff deemed him in the Dull Normal or Borderline range of intelligence based on their belief that he had held responsible jobs and supported his family and because his behavior was "normal." After a period of nine years without a test, Holladay was administered the WAIS in 1978, when he was twenty-eight years old. He scored a 64 on the Verbal Scale and a 81 on the Performance Scale for a Full Scale IQ of 69. In 1969, a little over a year later, Holladay was again administered the WAIS and this time scored a Full Scale IQ of 72, with a 69 on the Verbal Scale and an 80 on the Performance Scale. At that time, the evaluating psychologist opined that Holladay should be evaluated for a learning disability but no evaluation was ever performed.

After his arrest for the murders, Holladay was administered parts of the WAIS-R in 1987. On this he scored a 69 on the verbal portion and a 75 on the performance part for a full scale of 71. His score declined in the next test in 1991, presumed to be the WAIS-R, to 74 on the Verbal Scale and 61 on the Performance

16

Scale, for a Full Scale IQ of 65. On his last test, the Stanford-Binet Intelligence Scale - 5th Edition, administered by Dr. Salekin, Holladay scored a 58 Full Scale with a 61 on nonverbal and 58 on verbal.

Dr. Ackerson rejected all of the results of the IQ tests because she noted that they were not consistent and she did not know how they had been administered. Looking at one of the early tests that Holladay took, Dr. Ackerson observed that the notes accompanying this administration stated that Holladay responded "don't know" often, which could account for the lower test scores. Moreover, she noted the literature states that mentally retarded children typically have higher performance scores than verbal scores but Holladay's verbal scores were higher. He also performed lower on the subtests that are identified as easy for children with mental retardation and better on subtests identified as difficult for such children. With respect to the March 1969 IQ result of 66, Dr. Ackerson noted that the psychologist's diagnosis of Mild Mental Retardation did not comport with his comments that Holladay was "functioning well within the Borderline or Dull Normal range of intelligence" and that Holladay was able to hold jobs, support his family, and his behavior at the hospital was normal.[9] Dr. Ackerson observed that

---

[9] In this regard, Dr. Salekin pointed out that the psychologist's assumption that Holladay was able to hold jobs and support his family was not borne out by the record.

eight months later, in November 1969, Holladay was administered another IQ test, presumably the WAIS, on which his full score was 73. She noted that the increase in score could have been due to the practice effect; she opined that the 73 he received on that test was consistent with the 66 he had received before.

Holladay's tests in 1978 and 1979 were administered pursuant to a routine Alabama Department of Corrections diagnostic and classification program. Dr. Ackerson noted that despite the 69 Holladay received on the first test, the evaluator's overall clinical impression was that Holladay was functioning at the Borderline Mentally Retarded range. She further reported that the evaluator had opined that Holladay's subtest scores suggested cultural deprivation and organic factors contributed to his mental retardation. Holladay was then placed, pursuant to the evaluator's recommendation, in a "supportive but firm environment where he can work at constructive tasks and gain a sense of achievement." However, a little over a year later, he was retested because of the concerns of a corrections officer that Holladay was functioning much too well for the setting. On this test, Holladay scored a 72; the evaluator recommended that Holladay undergo further testing to rule out a learning disability and that Holladay could be transferred back into the general population. Of these two tests, Dr. Ackerson commented that Holladay's higher score on the performance aspect of the test comported with mentally

18

retarded individuals but that his improved performance scores over time did not comport with the relatively stable performance scores that mentally retarded individuals usually exhibit. In fact, she opined that his performance scores in the last two tests were in the "Dull Normal" or low average range.

After he was arrested for the murders, Holladay was administered a portion of the WAIS-R in 1987 and scored a 71. Dr. Ackerson stated that these scores were consistent with previous tests that were administered. Of his scores on the 1991 test (a full scale score of 65), Dr. Ackerson admitted that the administrator of that test testified in deposition that Holladay's performance on certain aspects of the test were consistent with mental retardation. However, she also stated that the administrator stated occasionally that the result of a particular test could indicate a learning disability.

Additionally, Dr. Ackerson testified that because Holladay had been on death row for seventeen years, he could not be administered a reliable IQ test now. This is because none of the intellectual assessment tools had been normed on death row inmates.

Dr. Salekin, by contrast, did not reject the previously administered tests and administered an IQ test herself because she reasoned that some form of quantification was needed. She noted that the administrator of the first IQ test

19

relied on the verbal score of 62 to state that Holladay was of borderline intelligence and that he should be able to proceed in regular school; Dr. Salekin commented that the administrator's prediction turned out to be untrue because Holladay was held back twice and placed into special education classes. She also pointed to his consistently low grades and the fact that he only completed sixth grade. In her opinion, the DHR and school records suggested that the results of the IQ tests were correct – i.e. that Holladay did in fact have significantly subaverage intellectual functioning. Further, although Dr. Salekin thought that the early test scores were low, that probably was the result of behavior (which the records confirm was an issue with Holladay), but even adding a full standard deviation to counteract that effect, Holladay would still be in the mild mental retardation sector. Finally, she testified that she was cautious about the validity of the first two tests because Holladay was only administered part of the test; however, she evaluated them in light of the later tests and the contemporary evidence in the record, all of which she believed supported a low IQ score in the mental retardation range.

Dismissing one of Dr. Ackerson's criticisms relating to the internal consistency of the IQ scores, Dr. Salekin testified that there is no reason to expect that Holladay's Verbal and Performance Scores would remain constant in relation to each other. Indeed, the variation did not signify anything so long as the

difference between the two scores is not statistically significant. Further, Dr. Salekin testified that Dr. Ackerson should have administered her own IQ test to determine the validity of the tests whose reliability she questioned, in order to see if there was consistency. In the test that she administered, Dr. Salekin found that Holladay had significant deficits in fluid reasoning, knowledge, and working memory. Given his lack of schooling, the deficits in knowledge were not surprising. Fluid reasoning refers to his ability to solve problems, and working memory involves the ability to manipulate information quickly. Both of these areas are ones that decline with age so Dr. Salekin was not surprised to see that they were lower. His strongest areas, she found, were in quantitative reasoning and visual spacial processing, although she noted that they were still in the mild mental retardation range. Dr. Salekin also administered the Woodcock-Johnson Tests of Achievement, which confirmed that Holladay's knowledge in academic subjects was globally deficient, which tended to rule out the learning disability that Dr. Ackerson had postulated.

In sum, Dr. Salekin rendered a confident opinion that Holladay labored under a significantly subaverage intellectual functioning that manifested itself before age eighteen. Although she acknowledged some possible uncertainties with respect to the early tests (1958), she did not reject them entirely, but evaluated them

in light of the later tests and in light of the contemporary evidence that was indicative of mental retardation and the low IQ scores in the tests.   For example, Dr. Salekin observed that the school records were "replete with information that supports a diagnosis of mental retardation."

The district court considered all of the IQ tests, noting that the mean of those tests (excluding the most recent score of 58 on Dr. Salekin's Stanford-Binet test, which Dr. Salekin had acknowledged was artificially low because of aging and extensive incarceration), was 64.  The court recognized that Dr. Ackerson had rejected the IQ test scores based upon internal inconsistencies and the fact that Dr. Ackerson "did not know" how the tests were administered.  With respect to the former, the district court commented that Dr. Ackerson had cited no independent authority to support her opinion.[10]  With respect to the latter, the district court noted that: "Neither Dr. Ackerson nor the magistrate judge purport to suggest how the tests at issue were improperly administered, nor how the petitioner, particularly at age 9, malingered."  463 F.Supp.2d at 1342 n.22.  The district court also criticized Dr. Ackerson's "somewhat conclusory determination of no mental retardation," id. at 1344, citing Dr. Ackerson's comment that when "somebody comes to me and it's

---

[10]     We also note that Dr. Salekin considered the inconsistencies to which Dr. Ackerson pointed, and opined that most of the inconsistencies were not statistically significant, and opined that the inconsistencies did not render the IQ scores unreliable.

22

obvious they are not mentally retarded, it is not necessary for me to give an IQ test," id., and citing also the fact that Dr. Ackerson interviewed Holladay for only four to five hours as compared to Dr. Salekin's two-plus days, id. at 1244 n.24. Based upon the IQ tests and the other record evidence, the district court found "overwhelming substantial evidence . . . that he has had since before age 18 an IQ of less than 70." Id. at 1342.

We cannot conclude that the district court erred when it held that Holladay showed that he had significantly subaverage intellectual functioning and when it credited Dr. Salekin's interpretation of the scores. Although there may have been some problems with the test scores, we note that as Dr. Salekin pointed out they are fairly consistent, especially those from his adulthood, when he scored a 66, 73, 69, 72, 71, and 65. That range is only eight points. We note that the average of those scores is less than 70. We also note that both experts acknowledged that the November 1969 score of 73 was probably artificially high because of "practice effect,"[11] and that the 1979 test score of 72 may also have been.[12] Moreover, all of the scores were on WAIS tests, which may have reflected elevated scores because

---

[11]    This test was administered only eight months after the March 1969 test in which the score was 66.

[12]    This test was administered in March 1979, fourteen months after the January 1978 test.

23

of the Flynn effect.[13]  We cannot conclude that the district court was clearly

erroneous in discounting Dr. Ackerson's rejection of the test scores, and in

crediting Dr. Salekin's interpretation of the scores as reliable and consistent with

the contemporary evidence supporting mental retardation.  For example, we agree

with the district court that the fact that Dr. Ackerson "does not know" how the IQ

tests were administered is a weak criticism thereof.[14]  Moreover, although Dr.

Ackerson rejected the test scores, she nevertheless assumed that Holladay's IQ

would be low, but postulated that it was low for reasons other than mental

retardation – i.e. a learning disability and a poor home environment.  We cannot

conclude that the district court was clearly erroneous in rejecting this reasoning.

We agree with the district court that there is little support in the record for Dr.

Ackerson's alternate explanations.[15]  For the foregoing reasons, we hold that the

district court did not clearly err when it credited Dr. Salekin over Dr. Ackerson and

held that Holladay had demonstrated significantly subaverage intellectual

---

[13]     See note 4, supra.

[14]     If such criticism were sufficient to render unreliable past IQ tests, there would rarely be IQ tests over time upon which courts could rely.  It makes much more sense to evaluate past tests in light of all of the information available.

[15]     We note that Dr. Ackerson did not test Holladay for a learning disability.  We also note that Dr. Salekin's Woodcock-Johnson test indicated global achievement deficits, which tends to rule out a mere learning disability.  Finally, Dr. Ackerson seems to ignore the fact that poor home environment is a recognized contributor to mental retardation.

functioning.

### B. Significant or Substantial Deficits in Adaptive Behavior

The record in this case contains extensive documents from Holladay's youth and young adulthood, mostly from before he was incarcerated.[16] Among those records are the files from the Alabama Department of Human Resources ("DHR"), his school, juvenile court, Central State Hospital, various other hospitals, Taylor Hardin Secure Medical Facility, and the Department of Corrections. Additionally, both experts had access to Holladay's trial and deposition testimony. The experts also relied on extensive interviews, as detailed above.

Holladay's early life was quite tumultuous, as revealed in the DHR records. His father was an itinerant painter, who was absent frequently and when he was home was prone to domestic violence, abusing both his wife and children. Holladay's mother was an alcoholic who was also frequently absent; her absences were due her drinking binges. The DHR records recount visits to the home when no adult had been present for days and the children had been left to fend for themselves; some of the children were no more than toddlers at the time. In 1962, when Holladay was thirteen, the children were taken away from the Holladay

---

[16]    Both experts agreed that Holladay's adaptive functioning cannot be accurately assessed now because he has spent over 17 years in prison, a highly restricted and restrictive environment.

parents and placed in foster care. Also included in those records are Holladay's early run-ins with the law. At the age of thirteen, he was placed on "indefinite probation" for throwing rocks and placing spikes and other things on the railroad tracks. He also apparently hopped on and crawled under moving trains. Two years later, when he was fifteen, Holladay was arrested for committing a series of burglaries. As a result of these incidents, Holladay was sent to the Alabama Boys Industrial School for a year; a year after that he returned for another stint.

The school records present a picture of a child with severe learning difficulties. Holladay repeated both first and second grade and earned "F" in all academic subjects with the exception of one "C-" in third grade math. Initially he was cooperative, but by the time he reached fifth grade, he had become disruptive. One teacher reportedly had him wash her car during class rather than have him present during lessons. Indeed, notes in the record state that he was "somewhat of a retarded child," that his promotions were social, and that it was "doubtful that he [would] be able to do anything except present a problem in the classroom." His education ended after sixth grade, a year in which he was placed in a special education class. Before then, his elementary school principal had tried to have him placed in a special education school but it was full. The principal had noted that Holladay was "definitely mentally retarded" and another teacher wrote that he "did

26

not have the ability to learn on the level of an average child." Although he was first on the waiting list at that school, it was not until sixth grade that Holladay was able to be placed in a special education class. Holladay apparently did well in that class, with one of the teachers commenting that she believed his problems were more related to conflict within his home environment than serious intellectual limitations. She apparently based this statement on the fact that he had "some success in math" and "could say back to her some of the things that she read to him." In correspondence regarding his time at the Industrial School, it was suggested that because his impaired cognitive abilities prevented him from succeeding elsewhere, he should be placed in a trade school. There is nothing in the record, though, to suggest that this was ever done. Holladay remains functionally illiterate.

Holladay's work history is quite sparse because of his inability to retain jobs and his frequent incarcerations. According to a chart compiled by one of the experts, the longest that Holladay held a job was nine months. His jobs included pumping gas (which he had to leave because he could not work the cash register), loading trucks, stacking boxes, carrying and tearing off shingles from roofs, picking up trash for money, and assisting his father with painting. Of the last job, his brothers and Holladay reported that he could only do the unskilled labor and

27

would become confused when asked something involving any knowledge, such as the difference between a screwdriver and a scraper. He reported to one of the experts that he supported himself when not working by petty thefts and assistance from his wives and family. Holladay lost one job at a warehouse because other employees were concerned about his inabilities. Holladay reported that he had no trouble performing the menial jobs that he was assigned at work and on work duty at prison. Holladay and his brother reported that he obtained all of his jobs through the assistance of friends or family.

As intimated above, Holladay had frequent run-ins with the law. At the age of eighteen, Holladay was charged with Assault and Battery and Molesting. During the ensuing twenty years, he was arrested for Sexual Abuse First Degree, Burglary, Buying and Receiving Stolen Property, Peeping Tom, Sexual Abuse, Rape, Escape, Kidnaping, Attempted Murder, and various firearms charges. Holladay has twice attempted to escape from prison, with success only on his second attempt. In that attempt, he assisted another inmate as they overpowered a guard and stole a car. During the period after he had escaped, Holladay committed the murders for which he is now imprisoned. Holladay remained at large from March until October, with the murders taking place in late August. While at large, Holladay traveled extensively around the Southeast, staying in motels, trading and

28

selling cars, and finding odd jobs.

The Department of Corrections records reveal that Holladay was initially a violent and threatening inmate during his incarcerations. Since the early 1990s, however, Holladay's behavior has improved and he is even considered a model inmate. Both experts noted that Holladay was able to manage his diabetes, and that he was able to procure appropriate medical care while he was incarcerated.

Based on her review of the record, interviews with others who had known Holladay, and her interview with Holladay himself, Dr. Ackerson determined that Holladay was not retarded. While Dr. Ackerson acknowledged that Holladay had substantial deficits in academics, she did not think that he had deficits in any of the other adaptive functioning areas that are identified in the literature. And, although she did recognize Holladay's deficits in academics, she thought that the root of his problem was a learning disability, lack of educational opportunity (his school attendance was poor), behavioral problems, anti-social behavior, and his chaotic home environment. He appeared to have developed means to get around his illiteracy by using symbols, getting hitchhikers to direct him, using landmarks for directions, and getting others to do his reading and writing.

Dr. Ackerson characterized his functioning as being at "a higher level than is allowed with mental retardation." Specifically, she pointed to his testimony in

both the trial and depositions, which were both highly stressful situation and in which she thought he did well; she observed that his vocabulary did not seem consistent with someone who is mentally retarded and his memory seemed more advanced. Similarly, she thought that he functioned above the mentally retarded level during her interview with him, pointing to his ability to remember names, dates, and addresses, his ability to stay focused during conversation, and his knowledge of social niceties, such as standing aside to let her use the vending machine first and giving her the appropriate amount of personal space. She also pointed to his lack of problems with self-care and his ability to request appropriate medical attention; she also observed that he noted which medications worked and requested them later. Citing particularly Holladay's actions during the events surrounding the murders, Dr. Ackerson testified that Holladay had "engaged in very purposeful, deliberate action," and she noted that he had told someone days before the murders that he would kill his ex-wife. She noted that he managed not to be caught while engaging in criminal acts; fulfilled needs that he had (i.e. via the peeping behavior); eluded law enforcement; used an alias; avoided certain topics successfully when being interrogated by law enforcement officers; successfully traveled around different states; and did not arouse the suspicion of any law enforcement officers. Turning to employment, Dr. Ackerson opined that Holladay

30

was able to work but that she thought he did not want to; she pointed to his report that one of his jobs was easy, that he left one job because he could get paid more at another, and that he lost still another because of his choice to go "peeping" rather than going to work.

By contrast, Dr. Salekin found significant deficits in several areas of adaptive functioning.  Her review of the record left her with an impression of consistency across time that Holladay had significant deficits.  First, Dr. Salekin cited Holladay's academic record, noting that he was illiterate and had only completed the sixth grade.  Moreover, his school records reported that his promotion was "social" and that he received "Fs" in all subjects every year except once when he received a "C-."   To rule out Dr. Ackerson's theory that Holladay had a learning disability and statement that he did not have broad-based cognitive deficits, Dr. Salekin administered the Woodcock-Johnson Tests of Achievement - 3rd edition.  This test measures academic achievement and Dr. Salekin could not administer parts of it to Holladay because of his illiteracy.  The test revealed that Holladay suffered from broad-based deficits, with some strengths in oral language, oral expression, and listening comprehension; however, even those scores correlated to lower elementary grades.

Dr. Salekin also identified Holladay's communication, social, employment,

31

self-direction, community living, and health and safety skills as areas in which he had deficiencies. Beginning with communication, Dr. Salekin noted that Holladay was very tangential during her interviews with him and had to be redirected frequently; Holladay's former attorney also reported problems with keeping Holladay on track and an examining psychiatrist in 1990 also observed this trait. Additionally, Dr. Salekin cited one of the guards on death row and the same attorney for their statements that they had to keep things very simple in order for Holladay to understand; Dr. Salekin experienced that in her interview as well.

Turning to Holladay's social skills, Dr. Salekin noted that Holladay did not seem to understand the social awkwardness of his admission of bestiality or his accident with the enema. One source reported to her that Holladay frequently interrupts people and begins talking about unrelated topics while in conversation with others. Another source, Holladay's sister, reported that he often inappropriately flirted with her friends and got too close to people. Finally, she pointed to his sex offenses as evidence of very poor social skills.

With regard to his employment history, Dr. Salekin noted that it was extremely sparse, and that most of his jobs were obtained by others for him. All of his jobs were menial, as would be expected for someone in the mild mentally retarded range. Dovetailing with employment is Holladay's self-direction, or lack

32

thereof: Dr. Salekin testified that Holladay lacked any self-direction and that his criminality was more of a means of getting his needs met. However, she noted that he constantly was caught so he was not a very successful criminal.

Turning to health and safety, Dr. Salekin cited his decisions to climb under moving trains as a child, and to break into buildings when it was obvious to most people that there would be an alarm; she also noted that he did not stop when ordered to do so by officers and so ended up getting shot. Additionally, she wondered if he would be able to manage his diabetes if he were not in a highly structured environment because she thinks that he is too impulsive. Finally, she testified that there was no evidence that Holladay was capable of living on his own: during most of his adulthood, he moved in and out of his parents' home and relied on them and his wives for support. It did not appear that he had any responsibilities for maintaining a home or that he had those skills.

The district court noted initially that both Dr. Salekin and Dr. Ackerson agreed that Holladay had substantial adaptive deficiencies in the area of academics. 463 F.Supp.2d at 1343. The district court then addressed the area of work, and found "overwhelming evidence that Petitioner has never done and has never been capable of doing any work more than menial tasks." Id. The court had earlier described examples of Holladay's limitations with regard to work: e.g. in helping in

33

his father's painting business, he could not be depended on to buy paint, he would set a ladder upside down, and he did not know the difference between a screwdriver and a scraper; e.g. he was unable to work the machines at Kelly Tire; and e.g. he could not even operate satisfactorily as a "runner" in prison. Id. at 1337. The court found that the evidence indicated that the kind of menial tasks that Holladay could perform were "entirely consistent with the type of work which can be performed by the mentally retarded." Id. at 1343. The district court also cited his propensity to engage in sexual acts with animals (and his failure to understand the strangeness thereof) and his inappropriate attitude toward women (e.g. peeping and sexual assault) as evidence of Holladay's lack of social adaptation. Id. at 1346. In the end, the district court found significant deficiencies in the following categories of adaptive functioning: communication; social skills; community use; functional academics; and work. Id. at 1346; see also id. at 1347 (adding similar findings with regard to self direction, health and safety, and conceptual skills). In so finding, the court expressly discredited Dr. Ackerson's testimony for a number of reasons, see id. at 1343-47, and ultimately found that Dr. Salekin's opinion was better supported by the evidence, id. at 1347.

We cannot conclude that the district court erred when it found that Holladay had shown he has significant or substantial deficits in adaptive behavior. Like the

34

court below, we note that Dr. Salekin conducted a far more extensive interview with Holladay than Dr. Ackerson and also interviewed many more people in her preparation than Dr. Ackerson. Additionally, we note that although the criteria for diagnosing mental retardation includes determining that deficiencies were present before the defendant turned eighteen, Dr. Ackerson did not interview anyone who knew Holladay before he became an adult. Dr. Ackerson also selected a much narrower range of subjects with whom to speak about Holladay's conduct as an adult, focusing primarily on law enforcement and an obviously hostile ex-wife who would not even speak with Dr. Salekin. By contrast, Dr. Salekin spoke to several of Holladay's siblings, a former neighbor, a former lawyer, friends and prison personnel (guards and medical). And, although not a customary use of the test, Dr. Salekin administered the SIB-5 to two of Holladay's brothers in an attempt to quantify his adaptive behavior during the pre-eighteen years old period; Dr. Ackerson made no such efforts to quantify Holladay's behavior.

Another reason that the district court credited Dr. Salekin's opinion over Dr. Ackerson's was Dr. Ackerson's failure to administer an IQ test to Holladay. Dr. Ackerson testified that she did not need to administer an IQ test to rule out mental

retardation and that was the standard practice[17] if one could determine from interviews and record review that the subject's adaptive functioning was above that of a person with mental retardation. She testified that Holladay's testimony at trial and in deposition was inconsistent with someone whose IQ was that low because of mental retardation. However, we have reviewed those transcripts and agree with Dr. Salekin and the district court that they are not inconsistent with someone with mild mental retardation. Holladay testified against the advice of his attorneys, the trial judge, and even the prosecutor. During the testimony, he adamantly insisted that he was in Tennessee at the time of the murders when several eyewitnesses, including his former stepson, placed him at the scene of the crime in Alabama. When asked why his fingerprints were found in an abandoned car nearby, Holladay replied that someone must have stolen them or borrowed them. Similarly, he gave an implausible answer to the question of how a photo of him got in that car. During his deposition, he often sought his counsel's advice about answering questions but then disregarded it, and often answered in ways that showed poor judgment; this occurred despite his attorney's lengthy preparation of Holladay

---

[17] The district court countered her statement with a cite from James W. Ellis and Ruth A. Luckasson, *Mentally Retarded Criminal Defendants*, Geo. Wash. L. Rev. 414, 488 (1984-85), which stated that when mental retardation was suspected, testing should be administered. The court below reasoned that because this Court had stated that there was a reasonable likelihood that Holladay was retarded, Dr. Ackerson should have administered an IQ test.

before the deposition that involved concrete counseling on how to answer particular questions.[18] Moreover, we note, as did the district court, see 463 F.Supp.2d at 1335, that both the trial judge and the prosecutor characterized Holladay as "slightly mentally retarded;" indeed, the trial judge found this to be a non-statutory mitigating circumstance at sentencing.

Individuals with mental retardation have strengths and weaknesses, like all individuals. Indeed, the criteria for diagnosis recognizes this by requiring a showing of deficits in only two of ten identified areas of adaptive functioning. Dr. Ackerson's predominant focus on Holladay's actions surrounding the crime suggests that she did not recognize this.[19] Dr. Salekin's testimony, by contrast, cogently explained Holladay's strengths with regard to the events of the crime but also explained that some of what Alabama points to as strengths are activities that an individual with mild mental retardation is capable of performing. For the foregoing reasons, we cannot conclude that the district court was clearly erroneous in finding that Holladay had met his burden of proving that he has had significant

---

[18]    We note that this counseling may have resulted in Holladay's use of words that Dr. Ackerson thought were inconsistent with a person with mental retardation.

[19]    We reject Alabama's argument that the district court did not consider the events leading up to and following the crime and Holladay's success in avoiding capture. The district court considered these events at some length, but found that they did not foreclose a finding of mental retardation. See 463 F.Supp.2d at 1346-47.

and substantial deficits in adaptive behavior. We agree with the district court that there is extremely strong evidence to support the finding of substantial deficits with respect to functional academics and work. With respect to the former, the two experts agreed. With respect to the latter, the district court referred to the evidence as "overwhelming." 463 F.Supp.2d at 1343.[20]

### C. Onset Before the Age of Eighteen

The issue of whether Holladay's intellectual disabilities manifested themselves before the age of eighteen is not seriously disputed by Alabama; the main focus of its argument is that Holladay was never mentally retarded. We cannot conclude that the district court was clearly erroneous when it held that Holladay adduced sufficient proof of his mental retardation and that it manifested itself before he turned eighteen.

---

[20] Although the criteria for mental retardation requires a showing of deficits in only two of ten identified areas, a criteria which Alabama's brief on appeal never challenges, we note that both Dr. Salekin and the district court found significant deficits in adaptive functioning in several additional areas. Our review of the record persuades us that there is ample evidence to support the district court's findings, at least in a sufficient number of additional areas that we could not conclude that the district court clearly erred in finding that Holladay had not adapted so as to function in everyday life. For example, the district court's finding of deficits with respect to social skills is supported, inter alia, by his propensity to engage in sexual acts with animals (and his failure to understand the strangeness thereof), his inappropriate attitude toward women (e.g., peeping), his inappropriate social conversations, and stepping too close to others. And the district court's finding of deficits with respect to health and safety is supported, inter alia, by Holladay's reckless frolicking around trains and train tracks (apparently without realizing the danger), his tendency to run from police (e.g. he got shot several times), and his episode with the enema (and his seeming lack of embarrassment or ability to clean it up).

38

## IV.  CONCLUSION

In sum, we cannot conclude that the district court clearly erred in finding that Holladay had shown he was mentally retarded under the test utilized by the Alabama courts.  Accordingly, the judgment of the district court holding that Holladay is exempt from execution pursuant to <u>Atkins</u>, enjoining the execution, and granting the writ of habeas corpus is **AFFIRMED**.  However, the stay entered by the district court is continued until the expiration of the time for filing certiorari, and if filed, until the ensuing proceedings in the Supreme Court are finally resolved.